[No. S050583. Dec. 16, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
DEMETRIUS CHARLES HOWARD, Defendant and Appellant.

## COUNSEL

Michael J. Hersek, State Public Defender, under appointment by the Supreme Court, Kate Johnston and Alison Pease, Deputy State Public Defenders, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Robert R. Anderson and Dane R. Gillette, Chief Assistant Attorneys General, Gary W. Schons, Assistant Attorney General, Holly D. Wilkens, Adrianne S. Denault and Christine Levingston Bergman, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**CORRIGAN, J.**—Demetrius Charles Howard was convicted of first degree murder and attempted second degree robbery.[1] The jury found as a special circumstance that the murder was committed while defendant was engaged in the attempted robbery.[2] It returned a verdict of death. We affirm the judgment.

## I. FACTS

The facts are summarized here for background purposes. Further factual and procedural details are provided in the discussion of defendant's claims on appeal.

### A. *Guilt Phase*

#### 1. *Prosecution*

Cedric Torrence had known defendant for about four years at the time of trial. They lived in the same area of San Bernardino, and Torrence had fathered a child with defendant's sister. Torrence testified that on December 6, 1992, he picked up defendant to play football. Before the game, defendant hid a black .357-caliber handgun under a mattress at Torrence's house. After the game defendant retrieved the gun and put it in his belt. He wore black pants and a large white pullover sweater.

It was then evening. Torrence and defendant went across the street to a friend's house, where a number of people were drinking, talking, and smoking marijuana in the garage. Among those present was Mitchell Funches, who was wearing black clothing. Torrence heard defendant talking

---

[1] Penal Code sections 187, 211, and 664. Further statutory references are to the Penal Code.
[2] Section 190.2, subdivision (a)(17).

with Funches about doing a "jacking," meaning a robbery. Torrence thought they were asking him to go along, and said he did not want anything to do with it. Defendant told Torrence they were not talking to him. When Torrence warned that they might be caught, defendant said he would not be, and if he were he would go out shooting. Funches also had a gun, a chrome .380 automatic.

Torrence left the gathering and went to dinner. As he waited in a restaurant for his meal, a number of police cars drove by with sirens on. Torrence returned home and received a phone call from defendant, who said he was stranded in some apartments near an El Pollo Loco franchise, and needed a ride. Defendant sounded a little nervous, and said he had his strap on, meaning he was carrying the gun. Torrence drove to the location, where he saw many police cars and yellow emergency tape. He left, not wanting to get involved. Two days later, defendant called again. He asked Torrence, if the police were to speak with him, to say he had dropped defendant off at the El Pollo Loco around 9:00 p.m.

The murder victim was Sherry Collins, a 29-year-old mother who lived in the Acacia Park Apartments in San Bernardino. Collins had driven home with her five-year-old daughter, Randy, and parked in the garage. Randy was eight years old when she testified at trial. She remembered that it was dark in the garage, but the light in the car had gone on when her mother opened the door. Her mother was "fighting" with a man on the driver's side of the car, as Randy crouched in front of the passenger seat. Something broke the window on the passenger side, and her mother died. Randy climbed over her mother's body and ran to an apartment, where she told a lady what had happened.

Sergeant Dale Blackwell of the San Bernardino Police Department spoke with Randy at her grandmother's house four days after the murder. She was able to show that she knew the difference between a lie and the truth, and understood she should tell the truth. On the witness stand, Blackwell read portions of his report of the interview, which had been taped. Randy had told him that two "bad men" came up to the car as her mother opened the door. One with a white shirt walked up on the driver's side, and one with a black coat walked up on the passenger side. Her mother was kicking at the man on the driver's side and yelling "get out." The man on the passenger side broke the window with something he had in his hand. Randy did not see a gun at that point, but she heard it. Afterward, she noticed the man on her mother's side of the car holding a gun by his stomach.

Around 6:45 on the evening of the murder, Virginia Garduno had just arrived at her Acacia Park apartment when she heard a loud bang. She thought someone had crashed into the garage. A little girl soon knocked on her door, crying and saying, "my mommy got shot and she's bleeding from her nose." Garduno, frightened, turned off the lights and let the girl in. She was covered with flakes of glass, and told Garduno that her mother was dead and something about two Black men. Garduno called 911, and eventually brought Randy out to the police as they were investigating the crime scene.

Although she was very upset and sobbing, Randy was able to tell a policeman that two men had shot her mother, one in dark clothing and the other in a white shirt and dark pants. Randy could not tell the officer the race of the men. Garduno, however, reported that Randy had said the men were Black. A description of the suspects was broadcast.

The police found Sherry Collins lying across the front seats of her car, with her head hanging from the passenger seat. Her left foot was wedged between the driver's seat and the doorpost, and her right foot extended from the open driver's door. She had two gunshot wounds on the left side of her head. The passenger window was shattered. There was an expended casing on the garage floor.

Steven Larsen, whose house was near the scene, was working in his garage that evening and listening to a police scanner. He heard a dispatch about a shooting at the apartments, with a description of two Black men heading through an open area behind his house. He looked over the wall at the back of his yard and saw two men meeting the description. They were walking toward him, eight to 10 feet away. One wore all dark clothing, and the other was wearing "something white" with dark pants. Larsen yelled "stop," and the men looked at him. He ducked behind the wall, and heard them running. By the time he looked again, they were gone. Larsen ran to the front of his house. The men were in the street about 50 feet away. Larsen yelled at them to stop again, and they "took off running."

The University Village apartment complex was next to Larsen's neighborhood. On the evening of the murder, Theresa Brown heard helicopters above the complex and looked out her apartment window. She saw a Black man in dark clothing knocking on the door of another apartment. A few minutes later, the helicopters were still there and Brown looked out again. This time, the man was backed up against a wall as if trying to stay out of view. Brown called the police and described the man. At the dispatcher's direction she looked out another window, and saw a second individual walking into the complex wearing a white pullover and dark pants. Brown described this person to the dispatcher as well. When the dispatcher told her the suspects

were armed, Brown hid in her bathroom. Shortly thereafter, she heard gunfire, screams, and voices speaking through megaphones.

Brown's downstairs neighbors, Michael and Laurie Manzella, heard helicopters and a knock on their door. When they opened the door, they saw a Black man wearing a white pullover and dark pants talking to the tenant across the hall. They closed the door, and a little later heard gunfire. Mrs. Manzella took note of the pullover, because she had been looking for one like it. She was able to identify defendant in a photographic lineup as the man in the hallway.

Another University Village resident, James Chism, was leaving his apartment the same evening when he encountered defendant sitting on the stairs. Defendant asked for a ride home. When Chism declined, defendant asked to use the telephone to call for a ride. Defendant explained that he had been dropped off at the apartments to visit a girl, who was not home. Chism let defendant use his phone, and took the phone to give directions to the person on the other end of the line. He used the nearby El Pollo Loco as a reference point. Defendant did not seem to want to leave after the phone call, and appeared nervous. Chism got his jacket and told defendant he was leaving. Defendant asked if he could "hang out" outside the apartment. Chism said he could do as he liked, at which point Chism's roommates approached and said a police officer had been shot at the El Pollo Loco. Defendant walked out of the apartment complex with Chism and his roommates. Although Chism had given him directions to the El Pollo Loco, defendant went in the opposite direction.

The wounded officer was Edward Block, a California State University policeman. The shooter was defendant's companion, Funches. Block was on duty that night, and heard a broadcast description of the suspects in the Collins shooting. As he drove through a minimall, Block saw Funches and stopped him. During the encounter, Funches fired three shots, one of which struck Block in the abdomen below his bulletproof vest. Funches was soon apprehended by other officers in the area. He had discarded his gun, but it was recovered.

Another California State University policeman, Manuel Castro, was also patrolling in the area. He saw defendant using a public telephone at a 7-Eleven. Defendant matched the description of one of the suspects, and Castro arrested him. Defendant did not have a weapon. He gave Castro a false name. Six days later, a child playing outside the University Village apartments found a loaded .357-caliber revolver, black with a brown handle, hidden in ivy. The gun was turned over to the police. No fingerprints were found on it. At trial, Torrence identified the gun as the one defendant had been carrying.

Funches's fingerprint was found on the passenger side door of Collins's car. The bullet that killed Collins was fired from his gun. The bullet had fragmented as it passed through the car window glass, with the core entering Collins's temple and the jacket lodging in her scalp. Fibers found on the soles of Collins's shoes matched fibers from defendant's clothing. They were deposited on the shoes in a manner indicating that Collins's feet never touched another surface after coming into contact with the clothing.

## 2. *Defense*

Defendant testified that in December 1992, he was living with his cousins Patricia and Segonia Washington. He knew Cedric Torrence, but they were not close. He and Torrence had first met after defendant was released from prison in June 1992.[3] On December 6, 1992, defendant's girlfriend Roxanne called and said she was coming to see him. Roxanne was delayed, however, and defendant went with Torrence to the football game. He did not have a gun with him, nor had he ever seen the .357-caliber handgun that was found outside the University Village apartments.

Defendant did not play football himself, because he was planning to go out with Roxanne and did not want to get dirty. After the game, he went to Torrence's house, then to a neighbor's where he stood on the sidewalk with some others. Funches was not there; defendant said he had never met Funches. Defendant did not go into the garage. The men talked about women and cars, and someone got some beer. After an hour or so, defendant asked Torrence if he could use his telephone. The phone was unavailable, so defendant walked alone to a nearby market. He called home, and learned that Roxanne had arrived. She came to the market and picked him up. By this time it was dark. Their plan was to go to Compton, but defendant said he needed to visit his aunt and uncle first. Defendant had never been to their apartment before, but he had the address.

As they were driving, defendant and Roxanne argued, first about her having to wait for him at his house and then about another woman who was pregnant. The argument escalated as they neared his aunt's apartment. Roxanne ordered him out of the car and drove off, leaving him near a 7-Eleven. Defendant walked into an apartment complex, looking for his aunt's unit. He sat on some steps, feeling upset. Chism came out of an

---

[3] Defendant admitted pleading guilty to charges of felony assault with a deadly weapon, once in May 1984 and again in January 1990.

apartment, and defendant asked him for a ride. When Chism said that was not possible, defendant asked to use the phone. He called Torrence, who agreed to come get him at the El Pollo Loco across the street.

Defendant left the apartment complex with Chism and two of his friends. When he saw police around the El Pollo Loco, he walked the other way. Because he was in violation of his parole, defendant wanted no contact with the police. He walked back to the 7-Eleven, where he called his cousin for a ride. She could not give him one, so he called his sister. As he was talking to her, police officers arrested him.

The girlfriend, Roxanne Winn, testified that she came to get defendant in San Bernardino on the day in question, arriving around 3:00 in the afternoon. After about an hour, defendant called and she picked him up at a market. They were going to Compton; defendant said nothing about his aunt and uncle. While Roxanne was waiting at the house for defendant, Segonia had told her that she was sleeping with defendant, and was pregnant. Roxanne and defendant had a heated argument about this, and Roxanne told him to get out of her car. She left him near a 7-Eleven.

George Rivera was one of the football players, and it was his house where the group gathered after the game. He did not see defendant with a gun, or hear a conversation about "jacking." Funches was at Rivera's house, drinking with Rivera, Torrence, and defendant. Eventually, Torrence left to go to work. Rivera saw defendant and Funches walk away down the street together.

The parties stipulated that defendant's uncle, Willy Kelly, would testify that on the day defendant was arrested, Kelly was at a family function. He had offered defendant some cash to help him get started after his release from prison. Defendant was to come over around 7:00 p.m., but Kelly was delayed. When he returned to his apartment, he saw police in the area. Kelly would admit to a robbery conviction, a parole violation, a conviction of assault with a deadly weapon, and two petty thefts for which he was currently serving a prison term.

Patricia Washington testified that defendant, the son of her cousin, was living with her in December of 1992. Her daughter Segonia was living there as well. Patricia never saw defendant with a gun. She remembered Roxanne coming to the house, looking for defendant. Segonia testified that she remembered defendant leaving to play football, and telling her that Roxanne would be coming. Roxanne arrived while defendant was gone. Defendant

called and spoke to Roxanne, who left to pick him up. Later that night defendant called and said he was stranded after Roxanne kicked him out of the car. Segonia did not remember telling Roxanne that defendant was sleeping with anyone else.

B. *Penalty Phase*

The prosecution introduced evidence of defendant's two prior felony convictions for assault with a deadly weapon.

James Pearsall testified that in September 1989, he was attending a bachelor party in Fontana. He and a group of friends were standing around a parked vehicle, drinking beer. A young African-American rode up on a bicycle and began yelling and cursing at the group. Pearsall tried speaking to the man. As he did so, another African-American walked up. When Pearsall turned to look at this second individual, he was knocked unconscious. He was hospitalized and suffered permanent neurological damage. Defendant was convicted of assaulting Pearsall with brass knuckles.

Laura Carroll testified that in December 1983, she was working at a recreation center in San Diego. Defendant approached her and reported that a girl had been hurt on the playground. As Carroll and her boss were on their way to investigate, the boss's phone rang and he went back to answer it. Carroll went on with defendant. When they could not find an injured girl on the playground, Carroll went into a bathroom to look for her. Before she could turn on the light, defendant grabbed her from behind and forced her to the back of the bathroom. Carroll struggled, punching him in the face at one point. As defendant turned to leave, Carroll felt something hot on her neck. When he held up a bloody knife in the doorway, she realized she had been stabbed. Carroll screamed, and defendant said, "shut up, bitch." She suffered a deep neck wound, a painful recovery, and psychological trauma that continued to the time of her testimony.

The parties stipulated that Randy Collins, the daughter of the murder victim, would testify that she thought of her mother sometimes, missed her, and was sad about what happened to her.

The defense presented no evidence at the penalty phase. Counsel argued that defendant did not deserve the death penalty, because he was not the person who shot Sherry Collins.

## II. DISCUSSION

### A. *Pretrial Issues*

#### 1. *Constitutionality of the Jury Selection Process in Capital Cases*

In a supplemental brief, defendant argues that the process used in California for "death qualification" of jurors is unconstitutional.[4] The Attorney General notes, correctly, that defendant waived this claim by failing to raise it in the trial court. (*People v. Jennings* (2010) 50 Cal.4th 616, 687–688 [114 Cal.Rptr.3d 133, 237 P.3d 474] (*Jennings*).) Had the arguments been preserved, they would fail. We have rejected them in previous cases, and do so again here. Thus:

The death qualification process is not rendered unconstitutional by empirical studies concluding that, because it removes jurors who would automatically vote for death or for life, it results in juries biased against the defense. (*People v. Taylor* (2010) 48 Cal.4th 574, 602 [108 Cal.Rptr.3d 87, 229 P.3d 12] (*Taylor*), citing cases; *People v. Mills* (2010) 48 Cal.4th 158, 171 [106 Cal.Rptr.3d 153, 226 P.3d 276] (*Mills*), citing cases.)

*Lockhart v. McCree* (1986) 476 U.S. 162 [90 L.Ed.2d 137, 106 S.Ct. 1758] (*Lockhart*), which approved the death qualification process, remains good law despite some criticism in law review articles. (*Taylor, supra,* 48 Cal.4th at pp. 602–603; *Mills, supra,* 48 Cal.4th at p. 172.) "We may not depart from the high court ruling as to the United States Constitution, and defendant presents no good reason to reconsider our ruling[s] as to the California Constitution." (*People v. Steele* (2002) 27 Cal.4th 1230, 1243 [120 Cal.Rptr.2d 432, 47 P.3d 225].)

The impacts of the death qualification process on the race, gender, and religion of the jurors do not affect its constitutionality. (*Taylor, supra,* 48 Cal.4th at p. 603; see also *Lockhart, supra,* 476 U.S. at pp. 174–176.) Nor does the process violate a defendant's constitutional rights, including the Eighth Amendment right not to be subjected to cruel and unusual punishment, by affording the prosecutor an opportunity to increase the chances of getting a conviction. (*Taylor,* at p. 603; *Mills, supra,* 48 Cal.4th at p. 172.) Defendant claims the voir dire process itself produces a biased jury. We have held otherwise. (*People v. Catlin* (2001) 26 Cal.4th 81, 112 [109 Cal.Rptr.2d 31, 26 P.3d 357].)

---

[4] Defendant relies on the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and on article I, sections 7, 15, 16, and 17 of the California Constitution.

Death qualification does not violate the Sixth Amendment by undermining the functions of a jury as a cross-section of the community participating in the administration of justice. (*Lockhart, supra,* 476 U.S. at pp. 174–176; *Jennings, supra,* 50 Cal.4th at p. 688; *Taylor, supra,* 48 Cal.4th at p. 603.) Finally, defendant's constitutional rights were not violated by the prosecutor's use of peremptory challenges to exclude jurors with reservations about capital punishment. (*Taylor,* at p. 603, citing cases.)

### 2. *Requirement That Defendant Wear a Stun Belt*

At a pretrial hearing, defense counsel made the following statement in response to a question from the bench regarding matters to be decided before the jury entered: "The only thing, your Honor, is we discussed shackling before. I do still object to my client being shackled in the court room for the reason he never caused any outbursts. I understand the court intends to put on him a[n] electronic device that can be pressed and give him 50,000 volts if he does anything somebody does not like or runs or something like that.

"I would object to that for the same reason. He's never . . . acted out in any manner whatsoever. He's never been disrespectful to the court or anybody else. I would object on those grounds."

The court responded: "Well, it's a prophylactic measure, and given the nature of the case, I believe it would—and given the nature of Mr. Howard's past—. . . it can't be seen which is a nice thing about it—it [as]sures everyone that nothing unfortunate is going to happen. And it can't be seen by jurors. So it doesn't reflect poorly upon Mr. Howard in their eyes. But your objections are noted."

Defendant contends that by requiring him to wear a stun belt, the court violated his constitutional rights and contravened this court's ruling in *People v. Mar* (2002) 28 Cal.4th 1201 [124 Cal.Rptr.2d 161, 52 P.3d 95] (*Mar*).[5] The Attorney General argues that the record does not show defendant actually wore a stun belt during trial, as the only other reference to the matter is a notation in the clerk's transcript of the hearing that included the discussion quoted above. The Attorney General asserts that defendant's

---

[5] Defendant claims he was deprived of the rights to due process, equal protection, a fair and impartial trial, to testify in his own defense, and to be free from cruel and unusual punishment under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution. He also relies on article I, sections 7, 15, and 17 of the state Constitution.

failure to make an adequate record of any restraints imposed on him below results in a waiver of the issue on appeal. If the objection by defense counsel to the prospect of using a stun belt is deemed sufficient, the Attorney General claims the record does not support defendant's claim that he was prejudiced.

It is true that the record does not show whether the trial court followed through on its stated intent to require a stun belt as a "prophylactic measure." On the other hand, defense counsel did place an objection on the record. In any event, assuming defendant was required to wear a stun belt during trial, we agree with the Attorney General that the record affirmatively dispels any notion that he was prejudiced.

In *Mar*, we considered the procedures governing use of a stun belt that could be concealed beneath a defendant's clothing and would administer an eight-second, 50,000-volt electric shock if activated by remote control. (*Mar, supra*, 28 Cal.4th at pp. 1214–1215.) The *Mar* court held that the requirements set out in *People v. Duran* (1976) 16 Cal.3d 282 [127 Cal.Rptr. 618, 545 P.2d 1322], for determining when a defendant may be shackled in the courtroom, also govern the decision to compel a defendant to wear a stun belt during trial. Thus (1) there must be a showing of manifest need for the stun belt; (2) the defendant's threatening or violent conduct must be established as a matter of record; and (3) it is the function of the court to initiate whatever procedures it deems necessary to make a determination on the record that the stun belt is necessary. The court must make an independent determination based on facts, not rumor or innuendo, and must not merely rely on the judgment of jail or court security personnel. (*Mar*, at pp. 1217–1218; see *Duran*, at pp. 290–293; *People v. Lomax* (2010) 49 Cal.4th 530, 559 [112 Cal.Rptr.3d 96, 234 P.3d 377].)

The trial court in *Mar* had failed to make a record demonstrating manifest need for a stun belt. (*Mar, supra*, 28 Cal.4th at pp. 1222–1223.) The *Mar* court decided the error was prejudicial. "[D]efendant . . . clearly stated that the device made it difficult for him to think clearly and that it added significantly to his anxiety, and the trial transcript confirms that defendant was nervous while testifying at trial. It is, of course, not unusual for a defendant, or any witness, to be nervous while testifying, but in view of the nature of a stun belt and the debilitating and humiliating consequences that such a belt can inflict, it is reasonable to believe that many if not most

persons would experience an increase in anxiety if compelled to wear such a belt while testifying . . . . Moreover, defense counsel specifically noted that defendant was 'afraid that somebody's going to push the button,' and in light of the circumstances that defendant was on trial for having caused an injury to a law enforcement officer and that the activation of the stun belt was to be controlled by another law enforcement officer, defendant's expressed anxiety in this regard, even if not justified, is plausible." (*Id.* at pp. 1224–1225, citation omitted.)

In *Mar*, given "the relative closeness of the evidence, the crucial nature of defendant's demeanor while testifying, and the likelihood that the stun belt had at least some effect on defendant's demeanor while testifying," the court concluded that "even if the prejudicial effect of the trial court's error is evaluated under the *Watson* standard applicable to ordinary state law error (see *People v. Watson* (1956) 46 Cal.2d 818, 836–837 [299 P.2d 243]), there is a reasonable probability that the error affected the outcome of defendant's trial." (*Mar, supra,* 28 Cal.4th at p. 1225, fn. omitted.)

Here, the trial court erroneously failed to make the finding of manifest need required by *Mar*. Defendant attempts to appropriate the *Mar* court's prejudice analysis for his own use, but his case is quite different. Unlike Mar, defendant expressed no discomfort with a stun belt. Nor did defense counsel alert the court to any apprehension on his client's part. Defendant was not on trial for injuring a law enforcement officer, and there was no other indication of a plausible reason why he might be particularly nervous about a stun belt being activated. Most significantly, at sentencing defendant made an extended statement to the court regarding his mental state during trial. He made no reference to a stun belt or its effects on his demeanor while testifying. Instead, defendant claimed his testimony had been affected by antipsychotic medication. (We address defendant's arguments on this point in pt. II.D.2., *post.*)

Defendant told the court, "my facial expressions, or lack thereof, emotional responses, or lack of mannerism, made an impression on the jury on taking the stand. My demeanor could've had a significant bearing on my credibility, persuasiveness, and on the degree to which I could have invoked sympathy. My demeanor is also relevant to my confrontation rights . . . . The side effects of antipsychotic drugs may alter demeanor in a way that will prejudice all facets of the defense. The defendant must be able to provide needed information to his lawyer and to participate in the making of decisions on his own behalf." Defense counsel declined to comment on defendant's claims. The prosecutor noted that defendant had smiled occasionally during his testimony, responded properly, and seemed "very coherent." Defendant protested that the effects of the medication may not have been apparent, even

though the medication "causes drowsiness." The court commented, "my perception of Mr. Howard throughout these proceedings has been that he was coherent and responsive, and in no way appeared to be impaired by virtue of any medication or anything else."

 On this record, any error in compelling defendant to wear a stun belt was not prejudicial, even under the federal constitutional standard of review requiring reversal unless the error is harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824]; see *Mar, supra,* 28 Cal.4th at p. 1225, fn. 7.) Defendant made a concerted effort to convince the trial court that his defense had been hampered by problems with his demeanor on the stand. If wearing a stun belt had affected him, he certainly would have informed the court of that circumstance. Instead, he asserted only that medication had influenced him during his testimony. Neither the court, the prosecutor, nor defense counsel noted *any* problems with his demeanor, however. The court observed that defendant "in no way appeared to be impaired." Thus, if defendant was wearing a stun belt, it had no appreciable effect on him, even by his own account.[6]

---

[6] In a supplemental brief, defendant expands upon an argument made in passing in his reply brief, to the effect that an erroneous order requiring a defendant to wear a stun belt must be deemed structural error, reversible per se. He draws an analogy to *Riggins v. Nevada* (1992) 504 U.S. 127 [118 L.Ed.2d 479, 112 S.Ct. 1810] (*Riggins*), where the court reversed a conviction because the defendant was improperly given antipsychotic medication during trial. Defendant acknowledges that the *Riggins* court did not find the error to be structural, but he relies on language in *Riggins* regarding the impossibility of determining from the trial record whether the outcome would have been different had the defendant not been forcibly medicated. (*Id.* at p. 137.)

We are not persuaded. *Riggins* was considered by the *Mar* court, which observed: "There are, of course, obvious distinctions between the compelled use of a stun belt and the involuntary administration of antipsychotic drugs at issue in *Riggins*. Unlike the administration of antipsychotic drugs, the use of a stun belt is not claimed to be medically appropriate or medically therapeutic for the defendant. At the same time, the medical or psychological risks posed by the involuntary use of a stun belt are not as well established or well documented as those associated with the use of antipsychotic drugs. Nonetheless, the two situations do raise some of the same concerns—concerns that arise from the circumstance that the state's intervention may result in the impairment, mental or psychological, of a criminal defendant's ability to conduct a defense at trial." (*Mar, supra,* 28 Cal.4th at p. 1228.)

A stun belt does not have the same kind of direct and consistent effect on a defendant's mental state as an antipsychotic drug. As discussed above, the concern that defendant may have been psychologically affected by a stun belt in this case was put to rest by his own statements to the court about his mental state during trial. Indeed, this case is a good example of why it would be wrong to treat an improper stun belt requirement as structural error. Because the record may reflect the absence of prejudice, review to determine whether the error was harmless is appropriate.

B. *Guilt Phase Issues*

1. *Admission of the Handgun*

Defense counsel objected to the admission of the .357-caliber revolver found in a patch of ivy outside the University Village apartments, where numerous witnesses placed defendant on the night of the murder. Counsel claimed there was no foundation for this evidence, because there was "nothing to tie it to Mr. Howard." The court held a hearing under Evidence Code section 402, at which Cedric Torrence testified that he saw defendant with a black .357-caliber handgun on the night in question. He identified the weapon recovered from the ivy as the one defendant was carrying. Defense counsel cross-examined Torrence, who maintained his assurance that "that's the gun." Counsel argued that Torrence had been hesitant when first shown the gun, and made a positive identification "only after he was pushed."[7] The court ruled that the foundation for admission was sufficient.

Defendant contends the court abused its discretion. He disputes Torrence's credibility, notes that six days elapsed before the gun was discovered, and asserts that the evidence was irrelevant and prejudicial.[8] These claims lack merit.

■ "Only relevant evidence is admissible (Evid. Code, §§ 210, 350), and all relevant evidence is admissible unless excluded under the federal or state Constitution or by statute. (Evid. Code, § 351; see also Cal. Const., art. I, § 28, subd. (d); *People v. Heard* (2003) 31 Cal.4th 946, 972–973 [4 Cal.Rptr.3d 131, 75 P.3d 53].)" (*People v. Benavides* (2005) 35 Cal.4th 69, 90 [24 Cal.Rptr.3d 507, 105 P.3d 1099].) Evidence is relevant if it "ha[s] any tendency in reason to prove or disprove any disputed fact." (Evid. Code, § 210; see *People v. Garceau* (1993) 6 Cal.4th 140, 177 [24 Cal.Rptr.2d 664, 862 P.2d 664].) The trial court has broad latitude in determining relevance. We review such a ruling for abuse of discretion. (*Benavides, supra*, at p. 90.)

The gun in this case was plainly relevant to establish defendant's participation in the attempted armed robbery. It was found, concealed in shrubbery,

---

[7] When the gun was removed from the evidence envelope, Torrence said "yes." The following exchange with the prosecutor then occurred:

"Q. You are nodding your head.

"A. All I know is it was a black .357. I really didn't—

"Q. Are you able to say whether or not that's the actual gun?

"A. Yes, that's—yes.

"Q. That looks like the one you saw that night?

"A. Yes."

[8] Defendant claims violation of his rights to due process and a reliable penalty determination, under the Fifth, Eighth, and Fourteenth Amendments to the federal Constitution, and article I, section 28, subdivision (d) of the state Constitution.

near the crime scene and the apartments where defendant was seen on the night of the murder. It was within the trial court's discretion to find that Torrence's testimony identifying the weapon was sufficiently credible to present to the jury. (See *People v. Hinton* (2006) 37 Cal.4th 839, 890–891 [38 Cal.Rptr.3d 149, 126 P.3d 981].) Defendant complains that the court failed to weigh the prejudicial effect of the evidence against its probative value under Evidence Code section 352. However, defense counsel's argument on this point was limited to relevance and lack of foundation. Counsel stated that he was making "a 352 objection, in that without the first two, the relevancy and foundation, it would be prejudicial to allow it into evidence . . . ." Once the court determined that a sufficient foundation had been laid linking defendant to the gun found in the ivy, the premise of defendant's argument under Evidence Code section 352 was defeated.

■ Indeed, after Torrence identified the gun as the one defendant carried on the night of the murder, there was no "prejudicial effect" for the court properly to consider in connection with defendant's motion to exclude the evidence. " 'The prejudice that section 352 " 'is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence.' [Citations.] 'Rather, the statute uses the word in its etymological sense of "prejudging" a person or cause on the basis of extraneous factors. [Citation.]' [Citation.]" (*People v. Zapien* (1993) 4 Cal.4th 929, 958 [17 Cal.Rptr.2d 122, 846 P.2d 704].) In other words, evidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction. In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose.' (*Vorse v. Sarasy* (1997) 53 Cal.App.4th 998, 1008–1009 [62 Cal.Rptr.2d 164].)" (*People v. Doolin* (2009) 45 Cal.4th 390, 439 [87 Cal.Rptr.3d 209, 198 P.3d 11].)

The gun was relevant and highly probative evidence in this case, and not likely to provoke an emotional reaction from the jury. Defense counsel did not argue that it was unduly inflammatory, as he did in connection with the autopsy photograph we discuss next. The court properly admitted the gun into evidence.

### 2. *Admission of an Autopsy Photograph*

As noted, defense counsel objected to the admission of an autopsy photograph. The eight-by-12-inch picture shows Sherry Collins's head in profile, with two bullet wounds in the temple area. Counsel argued that the pathologist could describe and diagram the wounds without recourse to the

picture. The court commented, "it's not an especially gruesome photograph is it?" Counsel replied, "I've seen worse. Yes, I agree, but it is certainly—as I look at it, it certainly raises passions in me. That's what I'm trying to avoid in this case."

The court overruled the objection, noting that the photograph, while unpleasant, was "not extremely inflammatory or gruesome," and not likely to offend a juror so as to unduly prejudice defendant. Defendant claims this ruling was an abuse of discretion.[9] We disagree.

■ " 'The admission of photographs of a victim lies within the broad discretion of the trial court when a claim is made that they are unduly gruesome or inflammatory. [Citations.] The court's exercise of that discretion will not be disturbed on appeal unless the probative value of the photographs clearly is outweighed by their prejudicial effect. [Citations.]' (*People v. Crittenden* [(1994)] 9 Cal.4th [83,] 133–134 [36 Cal.Rptr.2d 474, 885 P.2d 887].)" (*Heard, supra*, 31 Cal.4th at pp. 975–976; see also *People v. Ramirez* (2006) 39 Cal.4th 398, 453–454 [46 Cal.Rptr.3d 677, 139 P.3d 64].) We have reviewed the photograph in question and, unlike those properly admitted in *Heard* and *Ramirez*, it is not particularly gruesome. (See *Heard*, at pp. 974–975 [photographs showing torture of sexual assault victim]; *Ramirez*, at p. 455 [photograph showing victim with her eyes cut out].) Autopsy photographs are routinely admitted to establish the nature and placement of the victim's wounds and to clarify the testimony of prosecution witnesses regarding the crime scene and the autopsy, even if other evidence may serve the same purposes. (*Heard*, at pp. 973–978, discussing cases.) The court did not err by admitting the photograph in this case.

### 3. *Sufficiency of the Evidence of Felony Murder*

In a supplemental brief, defendant contends the evidence was insufficient to establish an attempted robbery, which was a predicate for both the felony-murder theory underlying the first degree murder charge and the felony-murder special circumstance. He also argues that the evidence failed to establish that he was one of Sherry Collins's assailants. These claims fail.

"The standard of appellate review for determining the sufficiency of the evidence is settled. ' "On appeal we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value— from which a reasonable trier of fact could find the defendant guilty beyond a

---

[9] Defendant contends he was deprived of the rights to due process, a fair trial, and a reliable penalty determination under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution, and "parallel provisions of the state Constitution."

reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606.P.2d 738]; see also *Jackson v. Virginia* (1979) 443 U.S. 307, 317–320 [61 L.Ed.2d 560, 99 S.Ct. 2781].)" ' (*People v. Abilez* [(2007)] 41 Cal.4th [472,] 504 [61 Cal.Rptr.3d 526, 161 P.3d 58].) '. . . We review the sufficiency of the evidence to support an enhancement using the same standard we apply to a conviction. (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1382 [37 Cal.Rptr.2d 596].) Thus, we presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence.' (*People v. Carrasco* (2006) 137 Cal.App.4th 1050, 1058 [40 Cal.Rptr.3d 768].)" (*People v. Wilson* (2008) 44 Cal.4th 758, 806 [80 Cal.Rptr.3d 211, 187 P.3d 1041].)[10]

Here, the prosecution presented evidence that defendant and Funches, both armed, left Torrence's neighbor's house together after planning to commit a robbery. Not long thereafter, two men confronted Sherry Collins as she began to get out of her car. She resisted, kicking at the man on the driver's side, and Funches fired through the passenger window, killing her. Collins's daughter provided a description of the assailant on the driver's side that was consistent with defendant's attire on the night of the murder. A number of other eyewitnesses testified that defendant, or a person matching his description, was in the area shortly after the shooting. He was unsuccessful in his attempts to find someone to give him a ride, and was arrested not far from the scene of the crime. His gun was recovered nearby. Fibers consistent with his clothing were found on the soles of Collins's shoes. This evidence, and the facts that may reasonably be deduced from it, amply supports the jury's finding that defendant participated in an attempted robbery during which Collins was murdered.

██ Defendant reargues the evidence, but fails to overcome the presumption favoring the jury's findings of fact. Some of the evidence was circumstantial, but it was nevertheless substantial. " 'Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt. . . .' [Citation.] ' "Circumstantial evidence may be sufficient to connect a defendant with the crime and to prove his guilt beyond a reasonable doubt." ' " (*People v. Stanley* (1995) 10 Cal.4th 764, 792–793 [42 Cal.Rptr.2d 543, 897 P.2d 481], quoting *People v. Bean* (1988) 46 Cal.3d 919, 932–933 [251 Cal.Rptr. 467, 760 P.2d 996]; see

---

[10] Defendant suggests there is a higher standard of appellate review for sufficiency of the evidence claims in capital cases. However, he cites only cases discussing factfinding procedures in the trial court. (E.g., *Ford v. Wainwright* (1986) 477 U.S. 399, 411–412 [91 L.Ed.2d 335, 106 S.Ct. 2595]; *Beck v. Alabama* (1980) 447 U.S. 625, 638 [65 L.Ed.2d 392, 100 S.Ct. 2382].) Whatever the import of these authorities may be, they have no application to our review of defendant's claim.

also *People v. Abilez, supra,* 41 Cal.4th at p. 504; CALCRIM No. 223 [circumstantial evidence may be as reliable as direct evidence].)

### 4. *Jury Instructions*

#### (a) *Felony-murder Instruction*

Defendant contends it was error to instruct the jury on first degree felony murder, when the indictment charged him only with second degree malice murder.[11] The argument is a familiar one. It posits that section 187 defines second degree murder and section 189 defines first degree murder, so that an indictment charging murder under section 187 permits a trial only on liability for second degree murder. Defendant recognizes that we have rejected this claim many times, but asks us to reconsider it. We decline to do so. (See, e.g., *People v. Bramit* (2009) 46 Cal.4th 1221, 1237–1238 [96 Cal.Rptr.3d 574, 210 P.3d 1171], citing cases; *People v. Hawthorne* (2009) 46 Cal.4th 67, 89 [92 Cal.Rptr.3d 330, 205 P.3d 245], citing cases.)

#### (b) *CALJIC Nos. 2.03, 2.71, and 2.72*

Over defense counsel's objection, the trial court instructed the jury with CALJIC Nos. 2.03, 2.71, and 2.72. Defendant claims this was error.[12]

CALJIC No. 2.03 told the jury: "If you find that before this trial the defendant made a willfully false or deliberately misleading statement concerning the crimes for which he is now being tried, you may consider such statements as a circumstance tending to prove a consciousness of guilt. However, such conduct is not sufficient by itself to prove guilt, and its weight and significance, if any, are matters for your determination."

Defendant notes that the sole justification mentioned by the court for this instruction was the fact that he gave a false name to the police when arrested. He does not, however, argue that the instruction was unsupported by the evidence. Rather, he makes a series of attacks on CALJIC No. 2.03 that we have consistently rejected. The instruction is not argumentative (e.g., *Taylor, supra,* 48 Cal.4th at p. 630; *People v. Page* (2008) 44 Cal.4th 1, 50–51 [79 Cal.Rptr.3d 4, 186 P.3d 395]), does not enable an improper permissive inference of guilt (e.g., *Taylor, supra,* at p. 639; *People v. Mungia* (2008) 44 Cal.4th 1101, 1135–1136 [81 Cal.Rptr.3d 614, 189 P.3d 880]), and is not

---

[11] Defendant asserts violations of the Sixth, Eighth, and Fourteenth Amendments to the federal Constitution, and of article I, sections 7, 15, 16, and 17 of the state Constitution.

[12] Again defendant cites the Sixth, Eighth, and Fourteenth Amendments to the federal Constitution, and article I, sections 7, 15, 16, and 17 of the state Constitution.

merely cumulative to instructions on circumstantial evidence (*Page, supra,* at p. 50).[13] We decline defendant's invitation to reconsider our views on these points.

CALJIC No. 2.71 told the jury: "An admission is a statement made by the defendant other than at trial which does not by itself acknowledge his guilt of the crimes for which the defendant is on trial, but which statement tends to prove his guilt when considered with the rest of the testimony.[14] You are the exclusive judges as to whether the defendant makes an admission and, if so, whether such statement is true in whole or in part. If you should find that the defendant did not make the statement you should reject it. If you find that it is true in whole or in part, you may consider that part which you find to be true. Evidence of an oral admission of the defendant should be viewed with caution."

Defendant contends the trial court erroneously gave this instruction based on the false name he gave to the police. However, as the Attorney General points out, the instruction plainly applied to the critical testimony by Torrence that defendant and Funches spoke about committing a robbery. It was also proper in light of Torrence's testimony that defendant had asked him to lie to the police about dropping defendant off near the scene of the crime. It was to defendant's benefit that the jury was told to view such evidence with caution. (See *People v. Frye* (1998) 18 Cal.4th 894, 959 [77 Cal.Rptr.2d 25, 959 P.2d 183].)[15] Defendant's assertion that the instruction is argumentative and one-sided is groundless. The jury was advised to make its own judgment on whether an admission was made, and if so was invited but not directed to consider it along with the rest of the evidence.

Defendant complains that CALJIC No. 2.72 was also prejudicially unfair because it told the jury that identity may be established by an admission, permitting him to be identified as one of the assailants merely because he provided a false name. This instruction, which explains the corpus delicti rule, stated: "No person may be convicted of a criminal offense unless there is some proof of each element of the crime independent of any admission made by him outside of this trial. The identity of the person who is alleged to

---

[13] Defendant also argues that CALJIC No. 2.03 was unnecessary in view of the general instructions on witness credibility given at his trial (CALJIC Nos. 2.23, 2.24). He refers us to a Montana case, *State v. Nelson* (2002) 310 Mont. 71 [48 P.3d 739, 745]. The instructions on witness credibility, however, make no mention of consciousness of guilt, and thus do not cover the same ground as CALJIC No. 2.03.

[14] Defendant notes that the written instructions provided to the jury referred to "the rest of the evidence," rather than to "the rest of the testimony." He makes no claim of error in this regard.

[15] Because several of defendant's statements supported giving CALJIC No. 2.71, we need not decide whether his giving a false name to the police would have alone been sufficient.

have committed the crime is not an element of the crime nor is it a degree of the crime. Such identity or degree of the crime may be established by an admission."

The principles set out in CALJIC No. 2.72 are long-established ones. (*People v. Ledesma* (2006) 39 Cal.4th 641, 721 [47 Cal.Rptr.3d 326, 140 P.3d 657].) Defendant was not prejudiced by the explanation that identity, unlike the elements of the charged crimes, may be established by an admission.

## C. *Penalty Phase Issues*

### 1. *Failure to Reinstruct*

The court gave CALJIC No. 8.84.1, informing the jury, in part: "You will now be instructed as to all of the law that applies to the penalty phase of this trial. You must determine what the facts are from the evidence received during the entire trial unless you are instructed otherwise. You must accept and follow the law that I shall state to you. Disregard all other instructions given to you in other phases of this trial."

Defendant claims the court erred by failing to reinstruct the jury on various points regarding evaluation of the evidence, most significantly the definition of reasonable doubt.[16] We have held that when the court gives CALJIC No. 8.84.1, it should reinstruct the jury with all applicable instructions governing the evidence presented at the penalty phase. (*People v. Lewis* (2008) 43 Cal.4th 415, 535 [75 Cal.Rptr.3d 588, 181 P.3d 947].) However, defendant fails to show that any instructional omission at the penalty phase was prejudicial.

Defendant's principal argument is that the jury had no guidance on the meaning of proof beyond a reasonable doubt and the presumption of innocence, which applied to the prior crimes evidence presented by the prosecution. However, defendant *conceded* that he was convicted of and committed both prior crimes presented to the jury. There was no contrary evidence. Thus, the only issues governed by the reasonable doubt standard at the penalty phase were conclusively resolved, and there was no occasion for the jury to reevaluate them. (See *People v. Cruz* (2008) 44 Cal.4th 636, 681 [80 Cal.Rptr.3d 126, 187 P.3d 970]; *People v. Harris* (2008) 43 Cal.4th 1269, 1322 [78 Cal.Rptr.3d 295, 185 P.3d 727].)

---

[16] He invokes the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution, and article I, sections 7, 15, and 17 of the state Constitution. The Attorney General correctly notes that defendant failed to request the evidentiary instructions he now claims were required. We consider the claim insofar as the failure to instruct may have affected defendant's fundamental rights. (§ 1259; *People v. Benavides, supra*, 35 Cal.4th at p. 111.)

Defendant mentions a number of other instructions that he claims the court should have given on its own motion. These include CALJIC Nos. 1.01 (instructions to be considered as a whole), 1.03 (admonition against independent investigation and discussion outside deliberations), 1.05 (use of notes), 2.01 (circumstantial evidence), 2.20 (credibility of witnesses), and 17.30 (jury not to take cue from judge).[17] However, nothing suggests the jury may have deliberated improperly in the absence of these instructions.

"Unlike defendant, 'we see no reason to assume' [citation] that the jurors would have felt free to evaluate the penalty phase evidence in a vacuum, rather than carefully and deliberately, as they apparently had evaluated the guilt phase evidence. Nothing in the closing arguments of the parties suggested that the jurors were free to make a standardless assessment of the evidence. Nor did the jurors ask any questions or request clarification as to how to assess any of the penalty phase evidence. [Citation.] In the absence of some specific indication of prejudice arising from the record, defendant 'does no more than speculate' [citation] that the absence of the instructions prejudiced him." (*People v. Lewis, supra,* 43 Cal.4th at p. 535, quoting *People v. Carter* (2003) 30 Cal.4th 1166, 1221 [135 Cal.Rptr.2d 553, 70 P.3d 981].) Here, as in *Lewis,* there is no reasonable possibility that the court's failure to reinstruct affected the penalty verdict. As we have noted, this state law standard for penalty phase error is "essentially the same as the harmless beyond a reasonable doubt standard of *Chapman v. California*[, *supra,*] 386 U.S. 18, 24 . . . ." (*People v. Lancaster* (2007) 41 Cal.4th 50, 94 [58 Cal.Rptr.3d 608, 158 P.3d 157].) Any error was harmless under the federal standard as well.

### 2. *Other Instructional Claims*

Defendant raises a number of well-worn claims of penalty phase instructional error. He fails to persuade us to abandon our settled views on these issues.

The court was not required to give an instruction on lingering doubt. (E.g., *People v. Hartsch* (2010) 49 Cal.4th 472, 511–513 [110 Cal.Rptr.3d 673, 232 P.3d 663]; *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1186–1187 [36 Cal.Rptr.2d 235, 885 P.2d 1].)

CALJIC No. 8.85 properly instructed the jury on its consideration of aggravating and mitigating factors. (E.g., *People v. Butler* (2009) 46 Cal.4th

---

[17] Defendant also refers in passing to instructions proposed by the defense and rejected by the court, but he marshals no argument or authority to establish the propriety of these instructions. He does make a separate argument with respect to one proposed instruction, on lingering doubt, which is noted in the next part of our opinion.

847, 875 [95 Cal.Rptr.3d 376, 209 P.3d 596] (*Butler*); *People v. Wilson* (2005) 36 Cal.4th 309, 360 [30 Cal.Rptr.3d 513, 114 P.3d 758].) The trial court was not required to give supplemental pinpoint instructions on mitigation. (E.g., *Butler, supra*, at p. 875; *People v. Musselwhite* (1998) 17 Cal.4th 1216, 1266–1269 [74 Cal.Rptr.2d 212, 954 P.2d 475].)

CALJIC No. 8.88 provides constitutionally sufficient guidance to the jury on the weighing of aggravating and mitigating factors. (E.g., *Butler, supra*, 46 Cal.4th at pp. 873–875; *People v. Geier* (2007) 41 Cal.4th 555, 618–619 [61 Cal.Rptr.3d 580, 161 P.3d 104].)

The standard instructions given in this case were not defective for failing to require proof beyond a reasonable doubt of the existence of aggravating factors, a preponderance of aggravating factors, or the propriety of the death penalty. Nor are the instructions unconstitutional for failing to prescribe any burden of proof, require juror unanimity, or set out a "presumption of life." (E.g., *Jennings, supra*, 50 Cal.4th at p. 689; *People v. Lomax, supra*, 49 Cal.4th at pp. 594–595.)

### 3. *Challenges to the Death Penalty Law*

"Defendant presents familiar challenges to California's death penalty statute, without providing persuasive justifications for us to reconsider our settled views. Written findings on the jury's sentencing choice are not required by the federal Constitution. (E.g., *People v. Parson* [(2008)] 44 Cal.4th [332,] 370 [79 Cal.Rptr.3d 269, 187 P.3d 1]; *People v. Harris, supra*, 43 Cal.4th at p. 1322.) The death penalty does not violate the Eighth Amendment, international law, including article VII of the International Covenant of Civil and Political Rights, or 'evolving standards of decency.' (E.g., *People v. Lindberg* [(2008)] 45 Cal.4th [1,] 54 [82 Cal.Rptr.3d 323, 190 P.3d 664]; *Harris*, at p. 1323.) Nor is review for intercase proportionality constitutionally compelled. (E.g., *Lindberg*, at p. 54; *Harris*, at pp. 1322–1323.)" (*Butler, supra*, 46 Cal.4th at p. 885.)

 Regarding his intercase proportionality claim, defendant contends his death sentence is manifestly disproportionate because Funches, who shot and killed Sherry Collins and wounded Officer Block, was sentenced to life without the possibility of parole in a separate trial, after the jury was unable to reach a verdict on the special circumstance.[18] However, we have explained that "the disposition of codefendants' cases 'is not relevant to the decision at

---

[18] Funches was originally a codefendant in this case, but the court granted a severance based on the inconsistent defenses contemplated by the two defendants. As defendant notes in his argument challenging the court's denial of his motion for a new trial, Torrence did not testify at Funches's trial, which took place after defendant's. (See pt. II.D.1., *post.*)

the penalty phase, which is based on the character and record of the *individual* defendant and the circumstances of the offense.' (*People v. Mincey* [(1992)] 2 Cal.4th [408,] 476 [6 Cal.Rptr.2d 822, 827 P.2d 388], original italics.) Moreover, intercase proportionality review is not required, 'and we have consistently declined to undertake it.' (*Ibid.*)" (*People v. Riel* (2000) 22 Cal.4th 1153, 1223 [96 Cal.Rptr.2d 1, 998 P.2d 969]; see also *People v. Taylor* (2009) 47 Cal.4th 850, 900 [102 Cal.Rptr.3d 852, 220 P.3d 872]; *People v. Arias* (1996) 13 Cal.4th 92, 193 [51 Cal.Rptr.2d 770, 913 P.2d 980]; *People v. Marshall* (1990) 50 Cal.3d 907, 938–939 [269 Cal.Rptr. 269, 790 P.2d 676]; *Pulley v. Harris* (1984) 465 U.S. 37, 50–51 [79 L.Ed.2d 29, 104 S.Ct. 871] [intercase proportionality review is not constitutionally required].)[19] "[T]he sentence an accomplice receives has little bearing on the individualized consideration of a capital defendant's penalty. (*People v. McDermott* (2002) 28 Cal.4th 946, 1005 [123 Cal.Rptr.2d 654, 51 P.3d 874]; *People v. Bemore* (2000) 22 Cal.4th 809, 857 [94 Cal.Rptr.2d 840, 996 P.2d 1152].)" (*People v. Gamache* (2010) 48 Cal.4th 347, 407 [106 Cal.Rptr.3d 771, 227 P.3d 342].)

Although defendant asserts that a comparison of his sentence with Funches's demonstrates how California's statutory scheme produces arbitrary results, he makes no attempt to compare Funches's prior criminal record to his. Moreover, a significant difference between the two proceedings was that Torrence did not testify at Funches's trial, for reasons that are not reflected on the record before us. Due to factors such as these, we have long held that "[t]he sentence received by an accomplice is not constitutionally or statutorily relevant as a factor in mitigation. Such information does not bear on the circumstances of the capital crime or on the defendant's own character and record. '[T]he fact that a different jury under different evidence, found that a different defendant should not be put to death is no more relevant than a finding that such a defendant should be sentenced to death.'" (*People v.*

---

[19] "Although we do not provide *intercase* proportionality review, we 'do undertake *intracase* proportionality review to determine whether the penalty is disproportionate to defendant's personal culpability.' (*People v. Steele, supra,* 27 Cal.4th at p. 1269.)" (*People v. Kelly* (2007) 42 Cal.4th 763, 800 [68 Cal.Rptr.3d 531, 171 P.3d 548].) Defendant does not request intracase proportionality review, nor does he challenge the trial court's decision on the automatic motion to modify the verdict of death (§ 190.4, subd. (e)), at which the court considered and rejected his arguments that the penalty was disproportionate.

In any event, the following facts were established at trial: Defendant was a major participant in a very dangerous felony. He personally confronted the victim in her garage, in the presence of her young child, with his weapon drawn. He had a prior record of serious assaults causing grave injuries to the victims. Despite his convictions for those offenses, and while on parole, he planned and undertook to commit an armed robbery that resulted in the violent death of a young mother. He and his accomplice fled the scene, leaving a five-year-old child to climb over her mother's body to seek help. We could not say the jury's assessment of the death penalty in this case is disproportionate. We note that the jury was well aware of the fact that Funches was the shooter.

*Bemore, supra,* 22 Cal.4th at p. 857, quoting *People v. Dyer* (1988) 45 Cal.3d 26, 70 [246 Cal.Rptr. 209, 753 P.2d 1].)

### D. *Posttrial Issues*

#### 1. *Denial of Motion for New Trial*

On November 15, 1995, after the jury had returned its penalty verdict but before sentencing, defendant filed a motion for a new trial. The motion was based on declarations by defendant, two fellow inmates, and Funches. Defendant's declaration, dated October 31, 1995, stated that he was riding a jail transport bus to court on May 10, 1995, the day the jury returned its guilt verdict. He was surprised to see Torrence, who said he had been taken into custody for driving with a suspended license. Torrence was seated directly behind defendant. Defendant asked him why he had lied about defendant's possession of a gun and his involvement in the crime. Torrence said the police told him witnesses had seen the two of them together, and he "was facing 25 to life." Defendant kept pressing Torrence about his lies. Torrence said he was scared, both by the "cops" and by "homies." He told defendant, "I didn't mean to do this to you, but I didn't want to be involved, didn't want life; didn't want to say about the others."

David James, in a declaration dated October 31, 1995, said he had been shackled to and seated next to defendant in the bus on May 10. James said that when defendant addressed Torrence (or "Cedric," as James heard defendant call him), his tone was not loud, angry, or threatening. Cedric had responded that he was being pressured by some people, possibly gang members, and indicated that "he was being pressured by someone who had been at the scene." James thought it was clear that Cedric was admitting he had lied. Cedric said, however, that "they're 'still out there and would kill' him." James, a White man, did not want to become involved in this situation between two Black men. Nevertheless, defendant had asked him to remember the conversation because he intended to tell his attorney about it, and James was willing to testify if called to do so.

Brandon Michael Nunez was also on the bus. In a declaration dated November 7, 1995, he said he had overheard a conversation between defendant and another person, and that defendant had asked him to remember what was said. Nunez did not recall many details, but said that defendant had asked the other person why he had lied, "and specifically about having a gun in his possession." The other person had given excuses "about threats or something like that."

Funches supplied a declaration in which he said he had smoked PCP on the day of the murder. Defendant was not with him during the incident, and

Funches did not remember ever meeting him before they were arrested. Instead, Funches claimed he was with a friend named Kevin "Kimo" Allen. Funches did not remember how they arrived at the scene, but he said he had barely escaped being hit by a car. "Kimo" had then begun fighting with the driver, and there was a gunshot. Funches thought he himself had shot the driver, but was not sure.

The prosecution attached James's and Nunez's criminal records to its opposition. James had a string of arrests and convictions for weapons, theft, and assault offenses. Nunez had been convicted of making terrorist threats, based on an incident in February 1995 that involved substance abuse and a degree of mental disturbance. He had been evaluated by a psychiatrist in April 1995, and was found competent at that time. The prosecution argued that the new evidence presented by defendant was merely impeaching and lacked credibility. It noted that Torrence had been confronted by defendant in a custodial setting that may well have induced him to claim he had been forced to testify as he did.

At the hearing on the motion, the court noted that it had presided over Funches's trial, during which Funches had feigned insanity and "[said] whatever is convenient at the time." The court believed "there would be serious, serious problems in anybody believing what Mr. Funches had to say about this matter." The criminal backgrounds of James and Nunez also presented credibility problems. Furthermore, the court said it was "receptive to the argument that [Torrence's] comments on the bus were what you would expect from one in that situation." The court recounted the evidence corroborating Torrence's trial testimony, including the gun found at the apartments matching his description of defendant's gun, the multiple witnesses who saw a person matching defendant's description near the crime scene, and the witnesses, including defense witnesses, placing defendant and Funches together shortly before the murder. The court found "most damning" the testimony of defense witness George Rivera that he had seen defendant and Funches leaving the gathering in the garage together. Finally, the court noted the clothing fibers found on the victim's shoes, which matched defendant's clothing.

Given the strength of this evidence, the court concluded that a different result was not reasonably probable if the evidence proffered by the defense, which the court acknowledged was newly discovered, were presented to another jury. Defendant contends the court abused its discretion.[20]

" ' "The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a

---

[20] He claims violations of the Fifth and Fourteenth Amendments to the federal Constitution, and article I, sections 7, 15, and 17 of the state Constitution.

manifest and unmistakable abuse of discretion clearly appears." ' [Citations.] ' "[I]n determining whether there has been a proper exercise of discretion on such motion, each case must be judged from its own factual background." ' [Citation.]

■ "In ruling on a motion for new trial based on newly discovered evidence, the trial court considers the following factors: ' "1. That the evidence, and not merely its materiality, be newly discovered; 2. That the evidence be not cumulative merely; 3. That it be such as to render a different result probable on a retrial of the cause; 4. That the party could not with reasonable diligence have discovered and produced it at the trial; and 5. That these facts be shown by the best evidence of which the case admits." ' [Citations.]" (*People v. Delgado* (1993) 5 Cal.4th 312, 328 [19 Cal.Rptr.2d 529, 851 P.2d 811].) "In addition, 'the trial court may consider the credibility as well as materiality of the evidence in its determination [of] whether introduction of the evidence in a new trial would render a different result reasonably probable.' [Citation.]" (*Id.* at p. 329.)

Here, we cannot say the court abused its broad discretion by denying a new trial. The court, which was very familiar with Funches, found his declaration utterly lacking in credibility. Funches's faulty memory was on display in the declaration itself, and his claim never to have met defendant before the murder was contradicted by multiple witnesses. No affidavit from "Kimo" was provided confirming his participation in the crime, nor was there any evidence corroborating this person's existence. As for the declarations regarding Torrence's statements on the jail transport bus, the court properly took into account the circumstances in which Torrence found himself, surrounded by inmates and confronted by a defendant against whom he had testified. The court carefully reviewed the trial evidence confirming Torrence's testimony. We note, as well, that defendant's attempt to account for his presence in the area of the crime was riddled with inconsistencies. We will not disturb the court's conclusion that the evidence of Torrence's admissions on the jail bus would not have made a different result probable on a retrial.[21]

---

[21] Defendant contends the best indication that he could obtain a more favorable outcome is the result of Funches's trial, which had concluded by the time of defendant's new trial motion. Defendant asks us to take judicial notice of the clerk's transcript of the Funches proceedings, to show that Torrence did not testify and the jury was unable to reach a verdict on the special circumstance allegation that the murder was committed in the course of a robbery. We grant the request. Although the transcript was not presented below, the trial court was fully acquainted with the result of the Funches trial. (See *People v. Hardy* (1992) 2 Cal.4th 86, 134 [5 Cal.Rptr.2d 796, 825 P.2d 781].) Defendant's argument, however, is unpersuasive. His counsel did not make it below. The new trial motion was based on newly discovered evidence that *impeached* Torrence's testimony. Therefore, the results of a trial that did not include Torrence's testimony at all sheds little light on the question before the court. The court properly weighed

Defendant faults the court for not obtaining live testimony from the declarants. However, defense counsel made no attempt to produce those witnesses, and submitted his motion on the declarations alone. In *People v. Hairgrove* (1971) 18 Cal.App.3d 606 [96 Cal.Rptr. 142], the only authority cited by defendant on this point, the affiant was present in court at the hearing on the new trial motion, and the court not only refused to hear from him but advised him against testifying. (*Id.* at pp. 609–611.) This is not such a case.

### 2. Failure to Hold Competency Hearing Before Sentencing

Immediately after the new trial motion was denied, the court granted defendant's request to be heard before sentencing began. Defendant told the court that during trial, he had been taking antipsychotic medication prescribed by a jail psychiatrist. He admitted he had not brought this to the court's attention, but claimed he had told his attorney. The psychiatrist had been on vacation during trial. Defendant said he did not want to be on the medication, which may have altered his demeanor in a way that affected the jury's impression of him and his ability to cooperate with counsel. He cited several United States Supreme Court cases, and said he "wanted to get this on the record so that the court may be aware of this."

Defense counsel told the court, "I don't have anything to say about this motion, at all, at this time." The court asked if there was any objection to looking into the matter before proceeding to sentencing. The prosecutor objected, noting that defendant had displayed no signs of impairment during trial. He had smiled from time to time, responded properly, and testified coherently. The court asked defendant who his doctor was. Defendant said it was a "Dr. Tan." The court asked defense counsel for his view on whether to proceed. Counsel again said he had nothing to say about the matter. Defendant contended that even if he did not appear to be "drooping over" or incoherent, "mentally, I can be because the medication is an antipsychotic medication which causes drowsiness, this is the argument in Riggins vs. Nevada." He claimed his rights were "infringed upon because of this medication," and asked for a hearing to address the issue.

The court said it was familiar with the authority cited by defendant because the same issue had been raised by Funches, who was in fact on antipsychotic medication during his trial. There had been "extensive discussions" and testimony on the matter in Funches's case. The court noted that defendant had appeared to be "coherent and responsive, and in no way . . . impaired by virtue of any medication or anything else." The court stated its belief that defense counsel would have raised the issue if it were in his client's interest.

---

the credibility of the proffered new evidence, and found it insufficient to support a finding that a different result would be likely upon retrial.

It decided that while defendant might seek to pursue the matter later in a habeas corpus petition, "this is an issue that is raised, at this point, in bad faith by [defendant] as a way of creating another issue for appellate review . . . . I find that there are just too many coincidences ·with what [defendant] has related this morning to what Mr. Funches and his counsel had to say, and I am not willing to proceed with that issue further."

■ Defendant claims the court erred by failing to suspend proceedings and hold a competency hearing before proceeding with sentencing.[22] We disagree. "Both federal due process and state law require a trial judge to suspend trial proceedings and conduct a competency hearing whenever the court is presented with substantial evidence of incompetence, that is, evidence that raises a *reasonable* or *bona fide* doubt concerning the defendant's competence to stand trial." (*People v. Rogers* (2006) 39 Cal.4th 826, 847 [48 Cal.Rptr.3d 1, 141 P.3d 135], italics added; see also, e.g., *People v. Lewis, supra*, 43 Cal.4th at p. 524.) When the court entertains no doubt about the defendant's competence, it is not required to hold a competency hearing. (*Lewis*, at p. 525; *People v. Rodrigues, supra*, 8 Cal.4th 1060, 1111–1112.) Here, the court found that defendant's assertions were made in bad faith. "A trial court's decision whether or not to hold a competence hearing is entitled to deference, because the court has the opportunity to observe the defendant during trial." (*Rogers*, at p. 847; see also *Lewis*, at p. 525.)

We have upheld trial courts' refusal to hold hearings even when defense counsel insisted their clients were unable to assist them. (*People v. Lewis, supra*, 43 Cal.4th at p. 525; *People v. Rodrigues, supra*, 8 Cal.4th at pp. 1111–1112; see also *People v. Howard* (1992) 1 Cal.4th 1132, 1163–1164 [5 Cal.Rptr.2d 268, 824 P.2d 1315].) In this case, defense counsel twice declined to join in defendant's attempt to suspend proceedings. Moreover, the trial court properly relied on its own observations that defendant had been coherent and unimpaired during trial, and that his claims were suspiciously similar to those made by Funches. The court did not err when it refused to hold a competency hearing.

### E. *Cumulative Error*

Defendant contends the cumulative effect of the errors at his trial requires reversal. However, our review has disclosed no prejudice stemming from any error or errors.

---

[22] He asserts violations of due process under the Fourteenth Amendment to the federal Constitution, and article I, section 15 of the state Constitution.

## III. DISPOSITION

We affirm the judgment.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Moreno, J., concurred.

Appellant's petition for a rehearing was denied February 16, 2011, and the opinion was modified to read as printed above.