Filed 5/24/13  P. v. Campos CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MARCOS ANTONIO CAMPOS,<br><br>    Defendant and Appellant. | B238020<br><br>(Los Angeles County<br>Super. Ct. No. KA090680) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Douglas W. Sortino, Judge.  Affirmed.

Verna Wefald, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Scott A Taryle, Supervising Deputy Attorney General, and John Yang, Deputy Attorney General, for Plaintiff and Respondent.

_____

Defendant Marcos Antonio Campos appeals from the judgment entered following a jury trial in which he was convicted of committing a forcible lewd act upon a child under the age of 14 and continuous sexual abuse of a child under the age of 14. Defendant contends the trial court erred by denying his motion for a new trial on the basis of newly discovered evidence. We affirm.

## BACKGROUND

B.C., who was referred to in the record as Jane Doe, was born September 21, 1996, was the youngest child of M.C. (Mr. C.) and G.C. (Mrs. C.). At the time of the charged offenses, B.C. lived in a two-bedroom house with her parents, her sister S. (who was one year older than B.C.), and defendant, who was B.C.'s brother and was about 16 years older than she was. B.C. and defendant also had several other siblings who did not live in the family home, including Maria L. and Blanca C., who were about 14 and 11 years older than B.C., respectively. B.C. shared a bedroom with S., who had Down's Syndrome. Defendant slept on the living room sofa in the family's first home in Baldwin Park, and in the laundry room in their second Baldwin Park home, to which they moved in February of 2010. Defendant moved out of the family home in 1999, but moved back in 2003. B.C. was very close to her sisters and parents.

Mrs. C. testified that sometime in March 2010, her daughter Maria told her that "something had happened between" B.C. and defendant. B.C. then told Mrs. C. that defendant had "touched" her. Mrs. C. spoke to defendant, who denied touching B.C., saying, "'If you think I did something, call the police.'" Mrs. C. could not believe defendant had done that. She did not call the police, but told defendant to leave the house. Defendant nonetheless remained in the house for one or two days while the family "looked for a place" where he could get substance abuse treatment. On May 7, 2010, B.C.'s teacher Cynthia Carrera phoned Mrs. C. and said that B.C. had an "aggressive attitude." Mrs. C. gave Carrera permission to refer B.C. to counseling.

Cynthia Carrera testified that she was B.C.'s speech therapist in middle school. B.C. has a below-average IQ and a language learning disability. Carrera and B.C.

2

developed a close relationship. B.C. had always been a "peacemaker" and "very joyful," but sometime around spring break in 2010, she changed dramatically. She became rude, began withdrawing from and rejecting her friends, and stopped seeking Carrera's assistance with homework assignments. She also began asking Carrera questions such as how a girl becomes pregnant and what kind of language boyfriends and girlfriends use. B.C.'s friend Nancy asked Carrera to talk to B.C. Carrera asked B.C. about her behavior but, atypically, B.C. became defensive and said that she had to tell Carrera something, but could not do so because people would become very upset. The next day, B.C. visited Carrera at lunch and spoke in a disjointed fashion. B.C. mentioned suicide and asked Carrera what language a boyfriend used with his girlfriend.

The next day, B.C. and Nancy visited Carrera together. B.C. seemed happy and said she had a lot to tell, though her family would be upset. B.C. said she was no longer considering suicide because an angel had come to her in a dream and told her she could not kill herself because too many people would be sad. The angel told her she needed to do what was right. B.C. revealed she had been upset because her brother had been making advances. Carrera testified that B.C. said, "'He's played with my boobs and he says things to me that a boyfriend would say to a girlfriend, and he tells me that I'm very beautiful . . . .'" B.C. also said that she had previously told her mother. She began to cry. Carrera told B.C. that her brother's conduct was wrong, and she was going to have to make some phone calls. B.C. said she felt relieved. Carrera phoned school officials and the Department of Children and Family Services (DCFS). Three days later, B.C. seemed confused and told Carrera that the DCFS had visited her home.

Officer Alexis Rodriguez testified that he went to B.C.'s school on May 11, 2010 in response to a report from social services. He spoke to B.C. in the principal's office, where she told him that her brother sexually touched her "bare skin" with his hands in the areas of the breasts, vagina, and buttocks. B.C. agreed to go to the police station with Rodriguez, and there he conducted a more thorough interview. Rodriguez testified that he was calm and friendly with B.C. and never threatened her. She revealed that defendant

began touching her sexually under her clothing with his hands when she was six or seven years old. B.C. told Rodriguez that when she was about eight or nine, defendant began removing her clothing and penetrating her vagina with his finger. Defendant told B.C. that if she told anyone, she and defendant would get in trouble. When B.C. was 9 to 11 years old, defendant penetrated her vagina with two fingers. When she was 11½ years old, defendant began raping her. She told Rodriguez that defendant held her down on the bed and inserted his penis in her vagina while he wore a condom. She said the experience was physically painful and lasted until fluid came out of defendant's penis. Thereafter, defendant did this to her two or three times a week until she was 13 years old. As B.C. described the incident, she was nervous and teary-eyed. She said she had not informed anyone until about two months earlier, when she told her sister.

Rodriguez spoke to Mrs. C., who confirmed that B.C. had told her defendant had touched her from the time she was 6 years old until she was 13. She also confirmed that there were times when B.C. and defendant were home alone together. Rodriguez, who was concerned that Mrs. C. had not reported the molestation, raised the possibility of putting B.C. in foster care. Mrs. C. began crying. She expressed anger toward defendant.

Mrs. C. testified that she did not believe that everything B.C. had reported was true. In particular, she did not believe that B.C. had been abused since the age of 6 because at that time, Blanca lived at home and slept in the same room as B.C. B.C. always shared a room with S., who never reported anything. Defendant and B.C. were never alone together until B.C. was 12 years old.

Social worker Deborah Davies conducted a video-recorded interview of B.C. on May 26, 2010. The parties stipulated to the accuracy of the recording and transcript, and the recording was played at trial in lieu of Davies testifying. B.C. told Davies that defendant touched and raped her when he was "drugged." She initially stated that this began when she was 10 years old, but later stated it began when she was 11. She remembered telling the police officer that it began when she was 6 years old, but she now remembered she was 10. B.C. said defendant would enter her bedroom at night, pull off

4

her blanket, and touch her all over her body with his hands. Sometimes he would take her clothes off. One time she locked her door, but defendant unlocked it with a kitchen knife. B.C. screamed, but her mother was asleep and did not hear her. On occasion, B.C. tried to run from defendant, but he would grab her and touch her. Sometimes she slapped his face, and he would scream at her. Sometimes she ran to her mother's room, but then defendant would "act[] normal."

B.C. told Davies that defendant raped her when she was 12 years old. She said he would take her clothes off, put on "protection" that he took out of his wallet, and penetrate her with his "private thing." The first time he did that, it hurt her and she bled. Afterward, she was in shock and cried all day. She was not able to walk properly and her sister Blanca noticed. Thereafter, the rapes would occur about once a week when her parents were at work and when defendant was drunk or doing drugs. She tried locking her door, but defendant pried it open and damaged the wood. Once, when defendant removed her clothing in the living room, B.C. yelled for S., who came into the room. Defendant told S. to go back to bed. S. left, and defendant proceeded to rape B.C. Sometimes B.C. tried to phone her mother, but defendant would grab the phone and break it. Sometimes defendant would put his fingers inside of B.C. B.C. initially told Davies that she was 13 the last time defendant raped her. Later she said that defendant had not raped her since she was 12; he had only touched her. Defendant always told her not to tell their parents or he would be sent to jail and might get killed. He also threatened that he would take her far away where no one would find them.

B.C. told Davies that after she told her mother about what defendant was doing, her mother confronted defendant, who said, "'Yeah, I did.'" B.C.'s father wanted to call the police, but B.C.'s mother did not want to and convinced her father to send defendant to rehabilitation.

Nurse and sexual assault examiner Dawn Henry testified that she performed a non-acute sexual assault examination on B.C. on June 1, 2010. She found B.C. to be fluent, articulate, and thoughtful during the interview portion. B.C. told Henry that defendant

5

began molesting her when she was 11 years old, and the last incident was after Christmas of 2009.  It began with him touching her breasts and genital area.  Henry noted on her report that there was also kissing of the genital area.  B.C. said defendant first placed his penis in her vagina when she was 12 years old.  B.C. said this hurt a lot and she bled.  Defendant did this on several other occasions.  Defendant told B.C. not to tell or she would get in trouble.

Henry testified that B.C. had a "good-sized" V-shaped tear in her hymen that had healed.  The tear extended 80 percent of the way to the base.  This indicated a penetrating injury and the location was consistent with injury from sexual intercourse.  Henry thus concluded that the physical findings were consistent with the history reported by B.C.

Rodriguez testified that during a break in defendant's preliminary hearing, which was held on April 12, 2011, he observed defense counsel talking to B.C. in the presence of her mother and sister.  Rodriguez heard counsel say, "'Sometimes there's things that you believe that somebody kind of told you and they're not true.'"  Rodriguez informed Detective Diana Larriva, who then spoke to B.C. and her mother.

Larriva testified that she also saw defense counsel speaking to B.C. during a break in defendant's preliminary hearing.  B.C. was looking at the floor and her hair was covering her face.  As soon as Rodriguez told Larriva what he had heard, Larriva interrupted and brought Mrs. C. away from the group.  B.C. followed her mother.  Larriva told Mrs. C. that DCFS was still investigating her and could remove B.C. from the home if Mrs. C. failed to protect her.

A transcript of B.C.'s testimony at defendant's preliminary hearing was admitted in evidence.  She testified that nothing happened to her before she was 11 years old.  The first time defendant did anything to her he touched her breast and her "private parts" with his hands, but over her clothes.  She testified this happened "once in awhile," "just one time," and on more than three days, but not more than five days.  This happened in her room, at night.  Her sister was in the room, but asleep.  Defendant told her not to tell anyone.  She denied that defendant had ever touched her with any other part of his body

6

and that he had ever put anything, including a part of his body, inside her body. She testified she told the police officer a lot of things that were not true because she was scared, but she told her teacher the truth. She was not sure whether she told the person who gave her a medical examination about what happened between her and defendant, but if she did, she told that person the truth. B.C. admitted telling the police officer numerous things, including that when she was about nine years old defendant "began to put his finger inside of [her] vagina." The prosecutor then asked, "How did he [*sic*] feel when he put his finger inside your vagina?" B.C. replied, "Not good." She then testified that it hurt. B.C. admitted that her earlier testimony that defendant never put anything inside her was not true, and explained that she had testified falsely, "Because like I said, I was scared. I didn't know what to say." B.C. then denied that defendant put his finger inside her when she was nine years old and stated, "That's when I was 12." She added, "When I was nine he started touching me."

B.C. further testified at the preliminary hearing that the incident she described to the police officer when she was about 11½ years old, when defendant came into her room, held her down on the bed, and put his penis in her vagina was true. She testified that this hurt her and that defendant used a condom. When asked if defendant had ever done this again after that occasion, B.C. replied, "No." But she then admitted that she truthfully told the police officer that defendant thereafter had sex with her approximately two or three times a week. The last time that defendant did this was "like two days before" B.C. told her mother what had been going on. On the last occasion, he did "the same thing," that is, "the touching" followed by sex.

B.C. further testified at the preliminary hearing that the charges against defendant made her uncomfortable and she did not want him to go to prison. Her parents had told her that they did not want defendant to go to prison.

On cross-examination at the preliminary hearing, B.C. testified that when she told her sister Maria about what defendant had been doing, she only mentioned that defendant touched her with his hand over her clothing. B.C. agreed that she did not mention

7

"penises or bare skin or penetration or anything." Defense counsel asked, "The reason you didn't tell her any of those things is because it hadn't happened; isn't that true?" B.C. responded, "That did happen." Defense counsel then asked, with reference to meeting B.C., "[D]id I tell you what to say or ask you what happened?" She replied, "Both." Defense counsel asked, "Now, did [defendant] tell you that if the family found out about what you two were doing it would be very embarrassing for everybody?" B.C. replied, "Yeah." She explained that she was afraid of defendant, but he had never hit her or said he was going to hit her. She "was afraid if he might like hit [her] or kill [her] or something." B.C. testified that when defendant held her down on her bed, she "screamed," but it did not wake her sister S., who was sleeping in the same room. B.C. estimated that the incident occurred around midnight. Her parents were at work. B.C. testified that her statement to "the police lady" that defendant "stuck his penis in [B.C.] two to three times a week" was true.

Defense counsel also asked B.C. at the preliminary hearing whether she ever found herself "remembering things that didn't, in fact, happen." B.C. said, "Yes," and agreed that such memories felt "real." On redirect examination, B.C. cited as an example her belief that defendant would murder her or do something bad to her. The prosecutor asked, "[S]o when you say that these things that you're remembering may not have happened, is that because of the conversation that you had with defense counsel before you came and testified?" B.C. replied, "Yes."

B.C. further testified on redirect examination at the preliminary hearing that she told the police officer the truth to the best of her ability, and while she was talking with the police officer and Detective Larriva she never made up something that was not true. She also testified that defendant slapped and punched her, but this was "at a different time," not when he was touching her in a sexual manner.

On recross-examination at the preliminary hearing, B.C. agreed that the police officer seemed pleased if she answered his questions a certain way and the police officer "brought up the word 'penis,'" "'finger' or 'vagina.'" She also agreed that defense

8

counsel told her "to be careful, to make sure that what [she] remember[ed] actually is a memory." Defense counsel asked, "[I]s there a good chance that everything you've testified to is, in my phrase, a false memory?" B.C. replied, "No," then agreed that she thought "all of this" was a true memory. She then testified that defendant began to threaten her after she told their parents about what he had done to her.

Carrera testified at trial that she had spoken to B.C. at the preliminary hearing and B.C. said she could not testify again because it was too confusing and the case was breaking up her family. B.C. also said she was confused because her sisters were protecting defendant.

At trial in late June of 2011, B.C. testified that when she was 12 years old, defendant began touching her breasts and her vagina with his hands over her clothing when no one else was home and he had been drinking. Defendant told her not to tell their parents, but did not threaten her. She was nonetheless frightened. Thereafter, this type of incident happened about once a week, usually when her parents were at work. One time, defendant did this to her in her bedroom when S. was sleeping with their mother. B.C. told defendant to stop, but he refused. She was going to scream, but he covered her mouth. The last time defendant touched B.C. was about a month before she told Maria what defendant had been doing. B.C. was 13 years old at the time of the last incident. B.C. steadfastly denied that defendant had ever engaged in any other type of sexual conduct, including any penetration or touching her under her clothing.

B.C. testified at trial that Maria had asked her why she was so close with defendant and acted as if she were defendant's wife or girlfriend. B.C. ultimately told Maria that defendant was touching her. Maria did not ask how defendant was touching her. She asked B.C. if she was lying. B.C. asked Maria to tell their mother, and Maria did so. Maria told their father, and they called defendant to come home. When defendant arrived, Maria screamed at him. Defendant acted like he did not know what they were talking about and became angry. B.C.'s mother told defendant to leave the house; he left that day and never returned. B.C. testified that between the time of her disclosure and the

9

police becoming involved, everyone at her house acted as if they were "frustrated, stressed out, sad, [and] guilty."

B.C. testified that she told Carrera because Carrera kept asking her what was wrong with her. She told Carrera that defendant was "bothering" her and had touched her "private part" and her breasts. B.C. denied asking Carrera how a girl got pregnant and what type of language a boyfriend used with a girlfriend. B.C.'s friend Nancy, who had previously told B.C. that she had been raped, was with B.C. when she confided in Carrera.

B.C. initially denied making the statements about defendant's conduct to which Rodriguez testified. On cross-examination she admitted she had made those statements, but insisted they were not true. She lied to Rodriguez because it was her first time in a police station and she was scared.

B.C. testified that on May 18, 2010, she and her mother went to a courthouse and obtained a restraining order against defendant, but she testified that the statements on the application for the order—including that defendant had been molesting her since she was 10 years old and raping her since she was 12 years old—were false.

B.C. also testified that she did not tell Davies the truth, and denied making the statements about defendant's conduct to which Davies testified.

B.C. testified that she did not tell the truth during the preliminary hearing because she was frightened by the way the prosecution team looked at her and pressured her. She initially denied testifying at the preliminary hearing that defendant first touched her sexually when she was 11 years old, but when she resumed her trial testimony after a recess, she admitted so testifying. She also admitted testifying that defendant put his finger inside her and it hurt. She nonetheless maintained that her preliminary hearing testimony was false. But she said she testified truthfully at the preliminary hearing about telling the truth to the person who gave her a medical examination.

B.C. testified that about a week before the trial there was a meeting at her house with herself, Maria, defense counsel, and the defense investigator in which they read

10

Rodriguez's police report to B.C. and talked to her about it. B.C. told them no one "stuck anything" in her "private parts," and defendant only touched her after the family moved to their second house in Baldwin Park. She also told them, truthfully, that Rodriguez threatened her with foster care unless she cooperated. Later she testified that Rodriguez never said anything about foster care.

B.C. testified that she wanted everyone in her family to get along and she tried her best to protect her family and make them happy. When she reported the molestation, her family was not happy. After defendant was arrested, her family was sad, and B.C. felt it was partially her fault because he was arrested because of what she said. B.C. thought about that a lot and wanted to "fix" it. She knew that what she said could affect what happened to her family and she wanted her family to be happy again. Her family would be happy if defendant got out of jail. B.C. did not love her brother in 2010 or at the time of trial and she did not want him to come home. She was not sure whether she wanted him to get out of jail. B.C. also testified that she did not want to testify at trial because she was scared of defendant and the angry way he looked at her in court.

Defendant was arrested at a rehabilitation facility and interrogated by Larriva and Sergeant Mark Harvey at the Baldwin Park Police station on May 19, 2010. Harvey opined that defendant seemed "withdrawn; continually looking down . . . I felt he didn't want to answer a lot of the questions, minimizing," and "burdened with guilt." An audio recording of the interrogation was played at trial. Defendant did not respond when Larriva asked if he was having sex with B.C., but when Larriva asked whether he "knew it was wrong," defendant replied, "Yeah, I know it was wrong." Defendant admitted he had sex with B.C. once in 2010, when she was 13 years old. He later said B.C. was "gonna be 13" at the time. He initially said he was asleep on the couch, B.C. began rubbing her buttocks against him, and he began rubbing against her. He awoke and regretted it. He later said he took off his clothes and B.C.'s clothes and rubbed his penis "onto her vagina skin-on-skin." He claimed he was impotent and never penetrated B.C. with his penis. Defendant later admitted that he had an erection on one occasion when he

11

interacted with B.C., and she "just went along" with it and touched his penis. He further admitted that he began to see B.C. "with wrong eyes" two years earlier. He admitted he "touch[ed] her sexually," and this occurred about once a month. He denied ever touching her breasts or touching her when she was six years old, but admitted putting his fingers into her vagina once. He later admitted he touched B.C. or had sex with her once a month for over two years. He sometimes tried to insert his penis, but failed due to his impotence.

Defendant told the police that B.C. had told him "it was wrong what [they] were doing," and "'you have to stop and I have to stop.'" He denied threatening her, but he might have said, "[D]on't say anything, because then . . . something bad's going to happen." (CT 516-517)~ B.C. just went along with defendant's conduct and "just took it."

Recordings of some of defendant's phone calls from jail to Mrs. C. were played at trial. In a call on February 23, 2011, defendant asked his mother whether any witnesses could come to testify that B.C. was not being truthful and stated, "It would be better if she recanted too, and said she didn't know what she was saying . . . because if she's [unintelligible] and everything, there is no rape and all that." He later said, "I have to plead guilty and, and it's a fucked up mess, because of what she said."

In a call on February 26, 2011, defendant told his mother, "I'm going to tell the truth to the judge, that I didn't penetrate her, I didn't abuse her sexually when she was 10-years old, like she says, that stupid bitch. [LAUGHS] Really. She's really crazy, that bitch. She did say that, but you know she's [unintelligible], so the evidence is there. I'm just going to tell the truth. 'I did disrespect her, I did touch her, but I didn't penetrate her.'" He later said, "I don't want to spend my whole life in jail . . . just for something stupid like this, right? That's what I get for, for being stupid, right? And now they don't . . . well, yeah, I did make a mistake, and I'm very sorry." Defendant also told his mother that the next court appearance was the day for him "to plead guilty to some charges, and to say [unintelligible] I really, I did touch her that way, and not the other way, you know what I'm saying? I mean, not the things they're accusing me of, they're not true."

12

In a conversation on March 14, 2011, defendant and his mother talked about Maria hiring an attorney for defendant. Defendant said that he was going to plead guilty if the attorney did not show up. He said that because of "everything that stupid girl said" and all of the evidence that the prosecution had against him, his only choice was to plead guilty. He just wanted the attorney's assistance to get a shorter sentence. He stated that he could get a shorter sentence if the charges against him for acts occurring when B.C. was "a lot younger" were dropped. Defendant said that when B.C. was 13 years old, "two or three things happened, but not, not like she said."

In a conversation on March 16, 2011, defendant stated, "Can he get my sentence down or not? Because the D.A. has a lot of evidence against me. And she's the evidence, she's the one who keeps saying I, I touched her and this and that, you know? If she weren't saying that and if she wouldn't show up it'd be a different story for my attorney. So my attorney doesn't have a lot to defend me with. The only thing I asked you to do was to ask him if he could get my sentence down. Because I never threatened her, I never forced her either, you know? That's what's getting to me, that she's saying I forced her, you know what I'm saying?"

On March 19, 2011, defendant told his mother that his attorney said he could prevail in the case because B.C. was a virgin, but defendant was worried about the admissions he had made to the police. Defendant said that "what I want to do is admit that, that I did touch her in front." He declared that "a lot of" what B.C. had said was "lies."

In a conversation on April 17, 2011 (after defendant's preliminary hearing), defendant asked his mother if she received the two letters he sent. His mother said she received one of them. Defendant responded, "I sent you another one too, yesterday, so you can give it to her so she can read it." He continued, "I thought she should read it so, so she can open her heart, and and so she sees that I'm not [inaudible]." He continued, "I'm saying, let her read it so she opens her heart, so she sees that I'm not against her. It's, it's a really tough case . . . ." He continued, "You can see that it's, this case is really

13

tough, but it's not that I'm against her, or, or him, but that's just the way they are. Right now my freedom depends a lot on everything she says and the last thing she said doesn't help me at all."

Mrs. C. testified that defendant had sent her letters to give to B.C., but she did not give them to B.C. or read them herself. She testified that when defendant was in the rehabilitation facility he thought the people who ran it were trying to kill him. At some point after he was arrested, defendant went to Patton State Mental Hospital for treatment that made him a little better. Mrs. C. testified that she did not believe the statements B.C. made to Davies. Mrs. C. was always home at midnight and was a light sleeper; if B.C. had screamed, Mrs. C. would have awakened.

Maria testified for the defense. She became suspicious about the relationship between B.C. and defendant because they spent a lot of time together and argued frequently. Once, in late 2009 or early 2010, Maria saw B.C. grab defendant's crotch while they were playing. Defendant seemed offended and told B.C. not to do that. Sometimes B.C. wanted to stay home with defendant instead of going out with other members of her family. She leaned on him when they watched movies together. B.C. became angry if defendant talked to women or said a woman on television was pretty. Maria confronted B.C. about her behavior on March 17, 2010. She asked B.C. whether defendant touched her. B.C. said he touched her "on the top and on the bottom." When Maria asked B.C. where this occurred, B.C. looked at the couch. B.C. asked Maria to tell their mother.

Maria did not think the police should have been called because any touching probably was accidental, she thought B.C. was lying, and she did not believe defendant raped B.C. He had been impotent for a long time, and S. was a light sleeper and never reported observing anything that disturbed her.

Maria further testified that defendant had a history of mental problems, such as hearing voices and believing that people were going to break in and kill her family.

14

While he was in the rehabilitation facility, his speech was incoherent at times, and at other times he said the employees were poisoning his food and trying to kill him.

Blanca testified that she moved out of the family home in 2007, but moved back in in 2009. (Blanca later referred to babysitting the various children in the family at her own home in late 2009.) In late 2009 or early 2010, Blanca noticed that B.C. always wanted to be with defendant. B.C. became angry when Blanca told defendant about a nice woman she met. B.C. also laughed at defendant's statements even when they were not jokes and not funny. Blanca believed B.C. was lying about defendant's actions. B.C. did not have "a reputation as a particularly honest person." Blanca also testified that defendant believed that the employees of the rehabilitation facility he went to killed the clients and sold their organs and were going to do that to him.

Mr. C. testified that Dawn Henry told him B.C. was a virgin. He further testified that, at the request of defense counsel, he examined the door to B.C.'s room in the family's second Baldwin Park home and found no damage. The two bedrooms in the house share a common wall and any sound made in one room could be heard in the other.

Defendant testified that he only touched B.C. sexually twice. The first occasion was around Christmas of 2009. B.C. leaned on him while they were watching television. He was in and out of sleep. Feeling her against him gave him an erection and he rubbed against her. He woke up and realized what he was doing and stopped. The second occasion was in the family's second Baldwin Park home in January or February of 2010. B.C. sat next to him on his bed while he was sleeping. He put his leg around her and placed his hand on her "private part" for some time. Defendant denied ever penetrating B.C. in any fashion. He may have inadvertently touched her breast while hugging her. B.C. never seemed bothered until she began hanging around with Nancy.

Defendant testified that he denied touching B.C. when his mother and Maria confronted him. He invited them to call the police if they believed he had done anything wrong. They threw him out of the house. By the time he was arrested, he was hearing voices and felt like someone was reading his thoughts and repeating them to him. He was

15

inebriated, confused, and "not in [his] right state of mind" when the police interrogated him. He told them the story about having sex with B.C. one time to stop the questioning. His statements to the police were not true. When he told the police B.C. had her hand on his penis, he was referring to the incident to which Maria testified. He felt better by the time of trial and no longer heard voices in his head.

Defense expert Dr. Mark Costanzo, a professor of psychology at Claremont, testified that false confessions occur, sometimes due to mental illness, youth, memory impairment, sleep deprivation, interrogation techniques, a need to protect someone else, or a belief it was in the confessor's best interest. Costanzo also testified that children were susceptible to and compliant with suggestions by an interviewer. Recorded interviews were thus essential.

The trial court granted defendant's Penal Code section 1118.1 motion to dismiss count 1, which charged defendant with committing a forcible lewd act upon a child under the age of 14 in violation of Penal Code section 288, subdivision (b) during the period of September 21, 2002, through September 20, 2004, when B.C. would have been six to seven years old. (Undesignated statutory references are to the Penal Code.) The jury acquitted defendant of committing a lewd or lascivious act upon a minor under the age of 14 during the same time period alleged in count 1. It convicted defendant of committing a forcible lewd act upon a child under the age of 14 in violation of section 288, subdivision (b) during the period of September 21, 2007, through March 1, 2008 (when B.C. would have been 11 years old), and continuous sexual abuse of a child under the age of 14 in violation of section 288.5, subdivision (a) during the period of March 2, 2008, through May 1, 2010 (when B.C. would have been 11 to 13 years old). The jury could not reach a verdict on count 3, which charged defendant with oral copulation or sexual penetration of a child 10 years old or younger in violation of section 288.7, subdivision (b) during the interval of September 21, 2005, through September 21, 2007, when B.C. would have been 9 to 10 years old. The court declared a mistrial and later dismissed the charge upon the motion of both parties.

16

Defendant filed a motion for a new trial, which the trial court denied, as discussed in greater detail in the next section. It sentenced defendant to prison for 18 years, consisting of consecutive middle terms of 12 years for the continuous sexual abuse conviction and 6 years for the forcible lewd act conviction.

## DISCUSSION

Defendant filed a motion for a new trial based upon several categories of purportedly newly discovered evidence and jury misconduct. Defendant's contention on appeal is based solely upon his claim of newly discovered evidence that B.C. "is suffering from mental illness." Accordingly, we limit our discussion to the portions of defendant's motion, the prosecutor's opposition, and the court's remarks that addressed that issue.

Defendant's new trial motion included a declaration from B.C., dated September 18, 2011, stating that she began hearing "voices" of her friend Lucy, who died in early 2010, before she "ever talked to Cynthia the teacher about my home situation." Lucy and the ghost of another little girl had been telling B.C. to kill herself. The other ghost girl carried a bloody knife and urged B.C. to kill her sisters, her mother, and herself because she was not "worth it." The other ghost girl said "she had been touched and molested" in the same house by her brother and that she had hanged herself. B.C. stated she had seen the other ghost girl kill her mother and brother, then hang herself. The other ghost girl said she was "going to come get [B.C.]" But B.C. had also seen an angel, who told her not to kill herself because she "was worth it" and "had a beautiful family." This also occurred before B.C. talked to Cynthia. The angel told her the other ghost girl was a demon and B.C. should ignore her. The angel told B.C. that she would "have a short life and would be a little angel."

B.C.'s declaration further stated that she "was so scared and disturbed by all this, including" the other ghost girl and threats by "Child Services" to place her in a foster home that she "actually tried to hang [herself] last month." She stated she "was placed in BHC Alhambra hospital (On July 27 and released August 3). I told all this to the psychiatrists. I was told that I have to take my medicines to stop seeing things and

17

hearing things. But things are not getting better and the voices and visions still happen." B.C.'s declaration then set forth the names and dosages of four medications. She stated she was again "placed in the hospital on September 7 for the same reason." B.C. stated she had seen the other ghost girl "yesterday," and concluded by stating, "As I dictate this the little ghost girl is whispering in my ear and telling me that she is going to my sisters [*sic*] house."

B.C. also stated in her declaration, "I feel bad about my brother being in jail and feel it is my fault. I would like him released as soon as possible. I am not afraid of him but it would be uncomfortable to be living in same [*sic*] house with him. I was never physically afraid of him and am not afraid now, but I do not want to talk to him or see him."

B.C.'s declaration did not state that her prior statements and testimony regarding defendant's conduct were false, exaggerated, or in any way inaccurate.

Defendant's motion also included a declaration from Mrs. C. that stated that B.C. became depressed after defendant went into "rehab," but now Mrs. C. realized that B.C. "is suffering from mental illness as well. More pressure was put on her after the trial by Child Protective Services who apparently threatened to put her in foster care. She reacted very badly to those threats. She was having conversations with people who are dead and tried to kill herself a couple of months ago and we had to put her in a psychiatric facility. She was released to us and is taking some psychiatric medicines."

Defendant's motion also included a declaration from Maria that stated, "Since the trial I have learned that my sister has been hearing voices and suffers from a mental condition probably similar to [defendant's]. She was talking to people who were deceased and hallucinating and having visions., [*sic*] some of them religious but I suspect it is a product of mental illness. I do not trust her to remember anything important or to distinguish between what really happened and what merely happened in her delusions or dreams. She has tried to kill herself last month. She told me that the voice was telling her that she either needed to kill someone else or to kill herself because the voice wanted

18

her to come join her.  She has since then been placed I n [*sic*] a psychiatric hospital and been placed on psych meds.  I believe that the mental condition existed prior to her making any claims about [defendant]."

The prosecutor filed a written opposition to the new trial motion to which she attached reports of two investigations into defendant's conduct toward B.C. by the DCFS commencing in May 2010 and resumed in June 2011.  Those reports indicated that in May 2010 DCFS had been contacted by both Carrera and B.C.'s psychologist, Erin Hubbard, regarding sexual abuse by defendant.  DCFS spoke to Hubbard again on July 30, 2010, and she stated she did "not have any other concerns for the children being allowed to remain in the care of the mother," would continue to work with B.C. in therapy, and would provide referrals to B.C. and the family "for additional mental health services if the need arise[s]."  DCFS spoke to Hubbard again on August 10, 2010, regarding the department's concern about whether there had been other sexual abuse incidents in the family.  Hubbard said she would explore the issue in therapy and "assist the child and the family to work through it in therapy."  On August 30, 2010, a DCFS employee interviewed B.C., who said she was continuing to see Hubbard for counseling once a week, she was making progress in counseling, and Hubbard was working with her on ways to control her stress.

On June 22, 2011, after B.C. had begun testifying at trial but before she completed her testimony, a DCFS employee interviewed her again in response to concerns expressed by Larriva about the family influencing B.C.'s testimony.  B.C. told the DCFS employee that there was no mental illness in her family, and stated she went to therapy once a week to address past sexual abuse by her brother.  She stated Larriva was threatening to put her in a foster home if she told the truth.  She further stated the police wanted her to testify to details she did not remember and believed were exaggerated.  The employee interviewed Mrs. C. the same day.  She "denied any mental illness in the family or home" and stated "that the entire family was currently in therapy" due to defendant's sexual abuse of B.C.

19

The DCFS report also stated that B.C. "was hospitalized on 7/26/2011 for hallucinations for a 72 hour hold. According to the child's therapist Dr. Hubbard she believed the hallucinations were brought on by stress caused by the child testifying in court to sexual abuse and the current DCFS investigation. The child was released on 7/28/2011." The report later memorialized a conversation with Hubbard on July 29, 2011: "Dr. Hubbard confirmed that the child is currently attending counseling and stated that she is very consistent with coming to counseling once a week. She stated that she has been working with [B.C.] for almost 2 years. According to Dr. Hubbard, the child, [B.C.,] continues to be re-traumatized due to the criminal proceeding. Further, she stated that the child has been through an 'incredible amount of stress' in the last 2 years and Dr. Hubbard was very concerned with the amount of stress the child had been undergoing due to the trial and now DCFS investigation. Dr. Hubbard reported that the child was hospitalized on Tuesday, 7/26/2011, after completing a visit with social workers at DCFS office. . . . No other concerns were noted by Dr. Hubbard."

In arguing his motion for a new trial, defense counsel stated, "I asked the family to please get her a psychiatrist because I did not trust any psychiatrist that was working within the Department of Family [*sic*] Services because they're in kahoots [*sic*] with the District Attorney's Office and I think they have an agenda and I think that the statement that was finally disclosed in the People's opposition which is from DCFS shows that the psychiatrist, Erin Hubbard, I think she is not being clear or is not being very knowledgeable about her own patient and we have [B.C.'s] declaration about the psych meds she's on and we don't have Erin Hubbard mentioning anything about that. . . . I asked the family, I pleaded with them, begged the family to send her to a good psychiatrist." Defense counsel continued, "[W]e now know the extent of the hallucinations and better flavor of the mental illness."

In denying the motion for a new trial the trial court explained, "Insofar as the new trial motion is based upon a request for an additional expert witness regarding false confessions and I guess also the victim's alleged hallucinations and fabrications of these

20

incidents, Dr. Costanzo did testify at trial. He testified about false confessions. He also testified about the suggestability [*sic*] of young witnesses. [¶] I believe there was also direct testimony from various witnesses that [B.C.] was having trouble at school, that she was not I guess for lack of a better way to phrase it one of the top students in her class, that she may have had problems with her intellect and her ability to communicate. I think that was fairly presented to the jury that she was not—I'm trying to word this in an artful manner—that she was not the brightest child, the brightest victim that could have testified in a case such as this, but she had certain learning disabilities. Her teacher, Ms. Carrera said she was in a remedial class. Her issue, her mental capacity, her suggestability [*sic*] to fabricating was ad[e]quately covered by other evidence in this case.

"Also, to the extent that there should have been additional testimony regarding her hallucinations or her mental illness, first of all, as indicated by the DCFS report submitted by [the prosecutor] in support of her opposition, that occurred after the trial. The psychiatrist opined that it was a result of the stress of having attended the trial and so since it occurred after the trial, to me it's not relevant to any issue prior to trial or testimony at trial. However, to the extent it might be considered as corroborative of prior instances of mental illness, again, I think that the issue of her mental capacity and the possible suggestability [*sic*] of a child witness was fairly presented to the jury. [¶] I also think again that this is also evidence that could have been presented had due diligence been exercised by the defense. There has been no showing by the defense that it could not have been presented had due diligence been exercised . . . ."

Defendant contends that the trial court abused its discretion by denying his motion with respect to newly discovered evidence of B.C.'s mental illness, and the denial violated due process.

A motion for a new trial may be based upon newly discovered material evidence that could not, with reasonable diligence, have been discovered and produced at trial. (§ 1181, subd. 8.) The evidence, and not just its materiality, must be newly discovered, and it should not merely be cumulative. (*People v. Howard* (2010) 51 Cal.4th 15, 43.)

21

The trial court may consider the credibility, as well as the materiality, of the new evidence in determining whether introduction of the evidence in a new trial would render a different result reasonably probable. (*Ibid*.) The "trial court may grant a motion for new trial only if the defendant demonstrates reversible error." (*People v. Guerra* (2006) 37 Cal.4th 1067, 1159, overruled on another point by *People v. Rundle* (2008) 43 Cal.4th 76, 151.) The determination of a motion for a new trial rests so completely within the trial court's discretion that its ruling will not be disturbed on appeal absent a manifest and unmistakable abuse of discretion. (*People v. Fuiava* (2012) 53 Cal.4th 622, 730.)

The trial court did not abuse its discretion in concluding that B.C.'s purported delusions arose after the trial. B.C. had been in therapy with Dr. Hubbard since at least May of 2010, and neither Hubbard nor any member of B.C.'s family ever suggested B.C. was delusional or otherwise mentally ill until about a month after B.C. completed her testimony in the trial (on June 28, 2011) and more than three weeks after defendant had been convicted of two charges. Dr. Hubbard opined that the hallucinations that had led to B.C.'s two-day hospitalization beginning July 26, 2011, were caused by stress and "re-traumatiz[ation]" resulting from having to testify at defendant's trial and the reopening of the DCFS investigation. Indeed, the DCFS report indicates that B.C.'s visit to the DCFS office precipitated her hospitalization. No one who interviewed B.C. and no one in her family testified that she seemed delusional. B.C.'s own testimony provided no ground for believing her to be delusional, and the trial court was able to observe her demeanor over the course of the five days that she testified. Only B.C.'s declaration tended to show that her hallucinations had begun prior to July of 2011, and it reflected a significant exaggeration about the duration of B.C.'s hospitalization (seven days, according to B.C., versus two days, according to Dr. Hubbard). B.C.'s declaration also reflected her desire to help free defendant from jail. The trial court was entitled to credit Dr. Hubbard's professional opinion and to conclude that B.C.'s declaration was, at the very least, exaggerated, and perhaps the product of her suggestibility, susceptibility to pressure by

her family, or her own desire to "fix" the sadness in her family caused by defendant being incarcerated, as she described in her trial testimony.

Alternatively, if B.C.'s delusions predated her statements exposing defendant's sexual abuse and her testimony at the preliminary hearing and trial, the trial court did not abuse its discretion by concluding that the evidence was not newly discovered, and it could, with reasonable diligence, have been discovered and produced at trial. This is illustrated by defense counsel's argument at the hearing on the new trial motion that he begged and pleaded with the family to send B.C. to "a good psychiatrist." The entire defense was based upon the theories that (1) B.C. had fabricated most of her allegations and exaggerated the conduct defendant admitted in his trial testimony, and (2) defendant was mentally ill when he was interrogated by the police. B.C.'s purported mental illness was completely compatible with both of these theories, and if counsel was begging B.C.'s family to have her see "a good psychiatrist," it is reasonable to infer that counsel suspected and hoped to develop evidence that would tend to show that B.C. was mentally ill. Counsel did not provide a declaration or testimony in support of the new trial motion addressing why B.C.'s purported mental illness could not, with reasonable diligence, have been discovered and produced at trial.

In addition, in light of the forensic evidence presented by Dawn Henry, defendant's admissions to the police, his admissions to his mother in his phone calls from jail, his admissions in his trial testimony, and the consciousness of guilt reflected in his statements during jail phone calls about the desirability of B.C. recanting or not testifying, it is not reasonably probable that introduction of B.C.'s testimony regarding delusions and her post-trial hospitalization in a new trial would render a different result reasonably probable. Such new testimony would no doubt be rebutted by evidence tending to show that the delusions arose only after trial and resulted from the stress of testifying at the trial and the reopening of the DCFS investigation. Defendant cites the trial court's dismissal of count 1 and the jury's inability to reach a verdict on count 3, with 11 jurors favoring a not guilty verdict, in support of his contention that a different result would have been

23

reasonably probable after a new trial. But counts 1 through 3, of which defendant was not convicted, alleged crimes committed when B.C. was under the age of 11, as to which even B.C.'s pretrial statements conflicted; counts 4 and 5, of which defendant was convicted, alleged crimes committed against B.C. when she was 11 to 13 years old, as to which B.C.'s pretrial statements and preliminary hearing testimony were fairly consistent. Count 5, continuous sexual abuse, was further supported by defendant's admissions to the police. Accordingly, the disposition of counts 1 and 3 has no tendency to establish the likelihood of a different result following a new trial. We need not separately address defendant's claim that denial of the motion violated due process, which appears to be coextensive with his state law claim. His failure to establish prejudice would require rejection of that claim, as well.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED.


MALLANO, P. J.

We concur:


ROTHSCHILD, J.


CHANEY, J.

24