Filed 2/27/23  P. v. Howard CA4/2
Opinion following transfer from Supreme Court

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for
publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication
or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E076084 |
| v. | (Super.Ct.No. FSB03736) |
| DEMETRIUS CHARLES HOWARD, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Ronald M.

Christianson, Judge.  Reversed.

Keker, Van Nest & Peters, Nicholas D. Marais, Maya Perelman and Victor Chiu

for Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorney Generals, Lance E. Winters, Chief

Assistant Attorney General, Julie L. Garland and Charles C. Ragland, Assistant Attorney

Generals, A. Natasha Cortina, Lynne G. McGinnis and Christine Levingston Bergman,

Deputy Attorneys General, for Plaintiff and Respondent.

1

Defendant and appellant Demetrius Charles Howard appeals from the trial court's order denying defendant's petition for relief under Penal Code[1] section 1170.95. For the reasons set forth *post*, we find that defendant made a prima facie showing that he falls within the provisions of section 1172.6, and is therefore entitled to a remand for further proceedings on his petition.

## FACTUAL AND PROCEDURAL HISTORY

### A.     PROCEDURAL HISTORY

On May 10, 1995, a jury convicted defendant of first degree murder under section 187. Additionally, the jury found true the special circumstances that the murder was committed in the course of a robbery or attempted robbery under section 190.2, subdivision (a)(17)(A). (*People v. Howard* (2010) 51 Cal.4th 15, 19 (*Howard*).) After the jury fixed the penalty at death, the trial court sentenced defendant to death. (*Ibid.*)

On December 16, 2020, the California Supreme Court unanimously affirmed the judgment. (*Howard*, *supra*, 51 Cal.4th at p. 46.) On February 16, 2011, the California Supreme Court denied defendant's petition for rehearing. On October 3, 2011, the United States Supreme Court denied certiorari. (*Howard v. California* (2011) 132 S.Ct. 213.)

On April 30, 2012, defendant filed an amended petition for writ of habeas corpus in the California Supreme Court, case No. S196958. On September 18, 2019, the

---

[1] All further statutory references are to the Penal Code unless otherwise specified. In addition, section 1170.95 was renumbered effective June 30, 2022, to section 1172.6. (Stats. 2022, c. 58 (A.B. 200), § 100, eff. June 30, 2022.) We will refer to the new numbering and current version in this opinion.

Supreme Court issued an order to show cause on "why the relief prayed for should not be granted on the ground that trial counsel provided ineffective assistance during the penalty phase, as alleged in Claim Nine." The California Supreme Court denied all remaining claims in the petition on the merits, and found four claims procedurally barred. The petition is pending in the San Bernardino Superior Court.

On July 22, 2019, defendant filed a pro. per. petition for resentencing under section 1170.95. In the petition, defendant requested that his murder conviction be vacated because of changes to sections 188 and 189, as amended by Senate Bill No. 1437 (Sen. No. 1437). On June 8, 2020, defense counsel filed a "memorandum in support of petition for vacatur and resentencing under [Sen. No. 1437]." On June 24, 2020, the People filed an opposition, and on July 6, 2020, defendant filed a reply to the opposition. Thereafter, the People filed two supplemental briefs and defendant filed a reply to the second supplemental brief.

On August 7, 2020, at the hearing on the petition, the trial court noted that the People had cited *People v. Gomez* (2020) 52 Cal.App.5th 1, review granted October 14, 2020, S264033 (*Gomez*), where the appellate court affirmed a ruling wherein the trial court denied the petition and required the defendant to file a writ of habeas corpus. After taking the matter under submission, on October 9, 2020, the trial court held another hearing on the petition. At the hearing, the trial court stated: "I find that the defendant's challenge to the special circumstance finding must be made by way of writ of habeas corpus and not by a petition under section 1170.95. Defendant's petition under 1170.95 is therefore denied."

3

On November 6, 2020, defendant filed a timely notice of appeal from the denial of his section 1170.95 petition. In an unpublished opinion filed on January 18, 2022, we affirmed the denial of the petition based on the state of the law at that time.

Defendant filed a petition for review, which was granted. On December 1, 2022, the California Supreme Court transferred the matter back to this court with instructions to vacate our previous decision and reconsider the cause in light of *People v. Strong* (2022) 13 Cal.5th 698 (*Strong*). In *Strong,* the California Supreme Court found that felony murder special-circumstance findings issued by a jury before the decisions of *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*), which clarified the terms "major participant" and "reckless indifference to human life" in the special-circumstance statute, do not preclude a defendant from making out a prima facie case for resentencing of a felony-murder conviction, even if the trial evidence would have been sufficient to support the findings under *Banks* and *Clark*.

On December 1, 2022, we vacated our previous opinion and requested that defendant and the People file supplemental briefs. Defendant in his supplemental briefing requests that this court direct the trial court to issue an order to show cause and hold a hearing pursuant to section 1172.6. In its supplemental brief, the People agree with defendant and concede that remand to the trial court for further proceedings under section 1172.6 is required. We will remand the matter to the trial court for further proceedings.

B.    FACTUAL HISTORY[2]

"1.    Prosecution

"Cedric Torrence had known defendant for about four years at the time of trial. They lived in the same area of San Bernardino, and Torrence had fathered a child with defendant's sister.  Torrence testified that on December 6, 1992, he picked up defendant to play football.  Before the game, defendant hid a black .357 handgun under a mattress at Torrence's house.  After the game defendant retrieved the gun and put it in his belt.  He wore black pants and a large white pullover sweater.

"It was then evening.  Torrence and defendant went across the street to a friend's house, where a number of people were drinking, talking, and smoking marijuana in the garage.  Among those present was Mitchell Funches, who was wearing black clothing. Torrence heard defendant talking with Funches about doing a 'jacking,' meaning a robbery.  Torrence thought they were asking him to go along, and said he didn't want anything to do with it.  Defendant told Torrence they weren't talking to him.  When Torrence warned that they might be caught, defendant said he wouldn't be, and if he were he would go out shooting.  Funches also had a gun, a chrome .380 automatic.

"Torrence left the gathering and went to dinner.  As he waited in a restaurant for his meal, a number of police cars drove by with sirens on.  Torrence returned home and received a phone call from defendant, who said he was stranded in some apartments near an El Pollo Loco franchise, and needed a ride.  Defendant sounded a little nervous, and

---

[2] The facts are taken from *Howard*, *supra*, 51 Cal.4th 15.

said he had his strap on, meaning he was carrying the gun. Torrence drove to the location, where he saw many police cars and yellow emergency tape. He left, not wanting to get involved. Two days later, defendant called again. He asked Torrence, if the police were to speak with him, to say he had dropped defendant off at the El Pollo Loco around 9:00 p.m.

"The murder victim was Sherry Collins, a 29–year–old mother who lived in the Acacia Park Apartments in San Bernardino. Collins had driven home with her five-year-old daughter, Randy, and parked in the garage. Randy was eight years old when she testified at trial. She remembered that it was dark in the garage, but the light in the car had gone on when her mother opened the door. Her mother was 'fighting' with a man on the driver's side of the car, as Randy crouched in front of the passenger seat. Something broke the window on the passenger side, and her mother died. Randy climbed over her mother's body and ran to an apartment, where she told a lady what had happened.

"Sergeant Dale Blackwell of the San Bernardino Police Department spoke with Randy at her grandmother's house four days after the murder. She was able to show that she knew the difference between a lie and the truth, and understood she should tell the truth. On the witness stand, Blackwell read portions of his report of the interview, which had been taped. Randy had told him that two 'bad men' came up to the car as her mother opened the door. One with a white shirt walked up on the driver's side, and one with a black coat walked up on the passenger side. Her mother was kicking at the man on the driver's side and yelling 'get out.' The man on the passenger side broke the window with something he had in his hand. Randy did not see a gun at that point, but she heard it.

6

Afterward, she noticed the man on her mother's side of the car holding a gun by his stomach.

"Around 6:45 on the evening of the murder, Virginia Garduno had just arrived at her Acacia Park apartment when she heard a loud bang. She thought someone had crashed into the garage. A little girl soon knocked on her door, crying and saying, 'my mommy got shot and she's bleeding from her nose.' Garduno, frightened, turned off the lights and let the girl in. She was covered with flakes of glass, and told Garduno that her mother was dead and something about two Black men. Garduno called 911, and eventually brought Randy out to the police as they were investigating the crime scene.

"Although she was very upset and sobbing, Randy was able to tell a policeman that two men had shot her mother, one in dark clothing and the other in a white shirt and dark pants. Randy could not tell the officer the race of the men. Garduno, however, reported that Randy had said the men were Black. A description of the suspects was broadcast.

"The police found Sherry Collins lying across the front seats of her car, with her head hanging from the passenger seat. Her left foot was wedged between the driver's seat and the doorpost, and her right foot extended from the open driver's door. She had two gunshot wounds on the left side of her head. The passenger window was shattered. There was an expended casing on the garage floor.

"Steven Larsen, whose house was near the scene, was working in his garage that evening and listening to a police scanner. He heard a dispatch about a shooting at the apartments, with a description of two Black men heading through an open area behind his

house.  He looked over the wall at the back of his yard and saw two men meeting the description.  They were walking toward him, eight to 10 feet away.  One wore all dark clothing, and the other was wearing 'something white' with dark pants.  Larsen yelled 'stop,' and the men looked at him.  He ducked behind the wall, and heard them running.  By the time he looked again, they were gone.  Larsen ran to the front of his house.  The men were in the street about 50 feet away.  Larsen yelled at them to stop again, and they 'took off running.'

"The University Village apartment complex was next to Larsen's neighborhood.  On the evening of the murder, Theresa Brown heard helicopters above the complex and looked out her apartment window.  She saw a Black man in dark clothing knocking on the door of another apartment.  A few minutes later, the helicopters were still there and Brown looked out again.  This time, the man was backed up against a wall as if trying to stay out of view.  Brown called the police and described the man.  At the dispatcher's direction she looked out another window, and saw a second individual walking into the complex wearing a white pullover and dark pants.  Brown described this person to the dispatcher as well.  When the dispatcher told her the suspects were armed, Brown hid in her bathroom.  Shortly thereafter, she heard gunfire, screams, and voices speaking through megaphones.

"Brown's downstairs neighbors, Michael and Laurie Manzella, heard helicopters and a knock on their door.  When they opened the door, they saw a Black man wearing a white pullover and dark pants talking to the tenant across the hall.  They closed the door, and a little later heard gunfire.  Mrs. Manzella took note of the pullover, because she had

8

been looking for one like it. She was able to identify defendant in a photographic lineup as the man in the hallway.

"Another University Village resident, James Chism, was leaving his apartment the same evening when he encountered defendant sitting on the stairs. Defendant asked for a ride home. When Chism declined, defendant asked to use the telephone to call for a ride. Defendant explained that he had been dropped off at the apartments to visit a girl, who wasn't home. Chism let defendant use his phone, and took the phone to give directions to the person on the other end of the line. He used the nearby El Pollo Loco as a reference point. Defendant did not seem to want to leave after the phone call, and appeared nervous. Chism got his jacket and told defendant he was leaving. Defendant asked if he could 'hang out' outside the apartment. Chism said he could do as he liked, at which point Chism's roommates approached and said a police officer had been shot at the El Pollo Loco. Defendant walked out of the apartment complex with Chism and his roommates. Although Chism had given him directions to the El Pollo Loco, defendant went in the opposite direction.

"The wounded officer was Edward Block, a California State University policeman. The shooter was defendant's companion, Funches. Block was on duty that night, and heard a broadcast description of the suspects in the Collins shooting. As he drove through a minimall, Block saw Funches and stopped him. During the encounter, Funches fired three shots, one of which struck Block in the abdomen below his bulletproof vest. Funches was soon apprehended by other officers in the area. He had discarded his gun, but it was recovered.

9

"Another California State University policeman, Manuel Castro, was also patrolling in the area. He saw defendant using a public telephone at a 7–Eleven. Defendant matched the description of one of the suspects, and Castro arrested him. Defendant did not have a weapon. He gave Castro a false name. Six days later, a child playing outside the University Village apartments found a loaded .357 revolver, black with a brown handle, hidden in ivy. The gun was turned over to the police. No fingerprints were found on it. At trial, Torrence identified the gun as the one defendant had been carrying.

"Funches's fingerprint was found on the passenger side door of Collins's car. The bullet that killed Collins was fired from his gun. The bullet had fragmented as it passed through the car window glass, with the core entering Collins's temple and the jacket lodging in her scalp. Fibers found on the soles of Collins's shoes matched fibers from defendant's clothing. They were deposited on the shoes in a manner indicating that Collins's feet never touched another surface after coming into contact with the clothing.

"2.    Defense

"Defendant testified that in December 1992, he was living with his cousins Patricia and Segonia Washington. He knew Cedric Torrence, but they were not close. He and Torrence had first met after defendant was released from prison in June 1992. On December 6, 1992, defendant's girlfriend Roxanne called and said she was coming to see him. Roxanne was delayed, however, and defendant went with Torrence to the football game. He did not have a gun with him, nor had he ever seen the .357 that was found outside the University Village apartments.

10

"Defendant did not play football himself, because he was planning to go out with Roxanne and did not want to get dirty. After the game, he went to Torrence's house, then to a neighbor's where he stood on the sidewalk with some others. Funches was not there; defendant said he had never met Funches. Defendant did not go into the garage. The men talked about women and cars, and someone got some beer. After an hour or so, defendant asked Torrence if he could use his telephone. The phone was unavailable, so defendant walked alone to a nearby market. He called home, and learned that Roxanne had arrived. She came to the market and picked him up. By this time it was dark. Their plan was to go to Compton, but defendant said he needed to visit his aunt and uncle first. Defendant had never been to their apartment before, but he had the address.

"As they were driving, defendant and Roxanne argued, first about her having to wait for him at his house and then about another woman who was pregnant. The argument escalated as they neared his aunt's apartment. Roxanne ordered him out of the car and drove off, leaving him near a 7–Eleven. Defendant walked into an apartment complex, looking for his aunt's unit. He sat on some steps, feeling upset. Chism came out of an apartment, and defendant asked him for a ride. When Chism said that was not possible, defendant asked to use the phone. He called Torrence, who agreed to come get him at the El Pollo Loco across the street.

"Defendant left the apartment complex with Chism and two of his friends. When he saw police around the El Pollo Loco, he walked the other way. Because he was in violation of his parole, defendant wanted no contact with the police. He walked back to

11

the 7–Eleven, where he called his cousin for a ride. She could not give him one, so he called his sister. As he was talking to her, police officers arrested him.

"The girlfriend, Roxanne Winn, testified that she came to get defendant in San Bernardino on the day in question, arriving around 3:00 in the afternoon. After about an hour, defendant called and she picked him up at a market. They were going to Compton; defendant said nothing about his aunt and uncle. While Roxanne was waiting at the house for defendant, Segonia had told her that she was sleeping with defendant, and was pregnant. Roxanne and defendant had a heated argument about this, and Roxanne told him to get out of her car. She left him near a 7–Eleven.

"George Rivera was one of the football players, and it was his house where the group gathered after the game. He did not see defendant with a gun, or hear a conversation about 'jacking.' Funches was at Rivera's house, drinking with Rivera, Torrence, and defendant. Eventually, Torrence left to go to work. Rivera saw defendant and Funches walk away down the street together.

"The parties stipulated that defendant's uncle, Willy Kelly, would testify that on the day defendant was arrested, Kelly was at a family function. He had offered defendant some cash to help him get started after his release from prison. Defendant was to come over around 7:00 p.m., but Kelly was delayed. When he returned to his apartment, he saw police in the area. Kelly would admit to a robbery conviction, a parole violation, a conviction of assault with a deadly weapon, and two petty thefts for which he was currently serving a prison term.

12

"Patricia Washington testified that defendant, the son of her cousin, was living with her in December of 1992. Her daughter Segonia was living there as well. Patricia never saw defendant with a gun. She remembered Roxanne coming to the house, looking for defendant. Segonia testified that she remembered defendant leaving to play football, and telling her that Roxanne would be coming. Roxanne arrived while defendant was gone. Defendant called and spoke to Roxanne, who left to pick him up. Later that night defendant called and said he was stranded after Roxanne kicked him out of the car. Segonia did not remember telling Roxanne that defendant was sleeping with anyone else." (*Howard*, *supra*, 51 Cal.4th at pp.19-25.)

## DISCUSSION

In light of the decision in *Strong*, *supra*, 13 Cal.5th, remand to the trial court for further proceedings is necessary.

SB 1437 became effective January 1, 2019. "[SB 1437] modified California's felony murder rule and natural and probable consequences doctrine to ensure murder liability is not imposed on someone unless they were the actual killer, acted with the intent to kill, or acted as a major participant in the underlying felony and with reckless indifference to human life." (*People v. Cervantes* (2020) 46 Cal.App.5th 213, 220.) As relevant here, SB 1437 added section 189, subdivision (e), which provides, "A participant in the perpetration or attempted perpetration of [qualifying felonies] in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the

13

actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2." (§ 189, subd. (e).) Section 190.2, subdivision (d) provides, "Notwithstanding subdivision (c), every person, not the actual killer, who, with reckless indifference to human life and as a major participant, aids, abets, counsels, commands, induces, solicits, requests, or assists in the commission of a felony enumerated in paragraph (17) of subdivision (a) which results in the death of some person or persons, and who is found guilty of murder in the first degree therefor, shall be punished by death or imprisonment in the state prison for life without the possibility of parole if a special circumstance enumerated in paragraph (17) of subdivision (a) has been found to be true under Section 190.4."

SB 1437 also created a process through which convicted persons can seek resentencing if they could no longer be convicted under the reformed homicide law. (§ 1172.6, subd. (a).) Section 1172.6, subdivision (a), provides in part, "A person convicted of felony murder or murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime, attempted murder under the natural and probable consequences doctrine, or manslaughter may file a petition with the court that sentenced the petitioner to have the petitioner's murder, attempted murder, or manslaughter conviction vacated and to be resentenced on any remaining counts." Section 1172.6, subdivision (c), provides, "Within 60 days after service of a petition . . . , the prosecutor shall file and serve a response. The petitioner may file and serve a reply within 30 days

14

after the prosecutor's response is served. These deadlines shall be extended for good cause. After the parties have had an opportunity to submit briefings, the court shall hold a hearing to determine whether the petitioner has made a prima facie case for relief. If the petitioner makes a prima facie showing that the petitioner is entitled to relief, the court shall issue an order to show cause. If the court declines to make an order to show cause, it shall provide a statement fully setting forth its reasons for doing so." If the petitioner makes a prima facie showing he is eligible for relief under section 1172.6, the court shall hold an evidentiary hearing. (§ 1172.6, subds. (c) & (d)(1).) At this hearing, either party may present new evidence and the prosecution bears the burden of proving the petitioner could still be convicted beyond a reasonable doubt. (§ 1172.6, subd. (d)(3).)

In *Strong*, the California Supreme Court resolved a split of the Courts of Appeal as to whether a special circumstance finding reached prior to *Banks* and *Clark* precluded relief under section 1172.6. *Banks* and *Clark* "substantially clarified the law" regarding what it means to be a major participant who acts with reckless indifference to human life for the purposes of the special circumstance statute. (*Strong*, *supra*, 13 Cal.5th at pp. 706-707, 721.) The *Strong* court concluded that where a defendant's "case was tried before both *Banks* and *Clark*, the special circumstance findings do not preclude him [or her] from making out a prima facie case for resentencing under section 1172.6." (*Strong*, at p. 721.) A court "err[s] in concluding otherwise." (*Ibid*.)

In this case, the trial court summarily denied defendant's petition for resentencing based on the felony-murder special circumstance finding made by the jury. However, the

15

jury finding predated *Banks* and *Clark.* Hence, the special circumstance finding did not preclude defendant from "making out a prima facie case for resentencing under section 1172.6." (*Strong*, *supra*, 13 Cal.5th at p. 721.) The trial court erred by summarily denying the petition relying on the special circumstance finding.

Accordingly, we must remand the matter for the trial court to consider defendant's petition in light of *Strong* as nothing in the record demonstrates that defendant is ineligible for relief as a matter of law. The trial court shall give defendant's counsel an opportunity to provide briefing, determine whether defendant has made out a prima facie case for relief and, to the extent necessary, issue an order to show cause and conduct an evidentiary hearing. (§ 1172.6, subds. (c), (d)(1) & (3).)

## DISPOSITION

The trial court's order denying the petition is reversed and the matter is remanded for further proceedings pursuant to section 1172.6, as set forth in this opinion.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER
Acting P. J.

We concur:

SLOUGH
J.

RAPHAEL
J.